IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA15-582

Filed: 1 March 2016

Beaufort County, No. 12-CVS-1086

BEAUFORT BUILDERS, INC., Plaintiff,

v.

WHITE PLAINS CHURCH MINISTRIES, INC., Defendant.

_____ .

WHITE PLAINS CHURCH MINISTRIES, INC., Defendant and Third-Party Plaintiff,

v.

CHARLES F. CHERRY, Third-Party Defendant.

Appeal by defendant and third-party plaintiff from amended judgment entered 28 October 2014 by Judge Wayland J. Sermons, Jr. in Beaufort County Superior Court. Heard in the Court of Appeals 4 November 2015.

*Ragsdale Liggett PLLC, by William W. Pollock and Amie C. Sivon, for plaintiff-appellee Beaufort Builders, Inc. and third-party defendant-appellee Charles F. Cherry.*

*White & Allen, P.A., by John P. Marshall, E. Wyles Johnson, Jr., and Ashley F. Stucker, for defendant-appellant and third-party plaintiff-appellant White Plains Church Ministries, Inc.*

DAVIS, Judge.

White Plains Church Ministries, Inc. ("White Plains") appeals from the trial court's amended judgment granting the motion of Charles F. Cherry ("Cherry") for judgment notwithstanding the verdict. On appeal, White Plains contends that the trial court erred by determining that it was precluded from recovery on a theory of negligence against Cherry individually as president of Beaufort Builders, Inc. ("Beaufort Builders") for economic injury resulting from the construction of a building that was the subject of a contract between White Plains and Beaufort Builders. After careful review, we affirm.

**Factual Background**

On 23 May 2011, Beaufort Builders and White Plains entered into a written contract ("the Contract") pursuant to which Beaufort Builders agreed to construct a church ("the Church") on land owned by White Plains in Belhaven, North Carolina in Beaufort County. Cherry and his wife are the co-owners of Beaufort Builders, and Cherry serves as the company's president.

As part of the construction of the Church, it was necessary to pour a concrete "pad" foundation upon which the actual structure would be built. Due to the low elevation in the Belhaven area, Federal Emergency Management Agency ("FEMA") regulations required the pad foundation for the Church to be built above the base flood elevation ("BFE"), which was set at seven feet in that part of Beaufort County. In order to ensure that the foundation was compliant, White Plains hired Ralph

Jarvis ("Jarvis"), a surveyor, to determine the elevation at the building site. In the course of performing this task, Jarvis inserted a metal pole into the ground at the building site and marked it at an elevation of eight feet — one foot higher than necessary for compliance with the seven-foot BFE. Based on his survey, Jarvis obtained an elevation certificate reflecting that the mark he had made at the site was, in fact, set at eight feet.

Cherry testified that in preparation for the pouring of the pad foundation, Pat Harrington ("Harrington") and Dave Saul, two individuals who were working under Cherry's direction on the building project, used a bulldozer to move dirt off of the site of the foundation to an area that was ultimately going to be used for the parking lot of the Church. Cherry elaborated on this issue as follows:

> Q. Who actually removed the dirt?
>
> A. Mr. Harrington and Dave Saul they worked together and he was actually the one on the site. They would do this because the grader was still on the site. He removed it.
>
> Q. Did you personally ever remove any dirt off this pad?
>
> A. No.
>
> Q. Did you ever do any grading outside the pad?
>
> A. I did.
>
> Q. What grading did you do outside the pad?
>
> A. The dirt they had pushed off the pad into the parking lot. You're looking at 4' of dirt. They pushed all that dirt

off so that it was just above so it was just above — had some steep places on it and we grade that we could work [sic]. We could get on the site properly. You know drive up without somebody getting hurt. The hurricane came shortly after that. There was a lot of water that washed and eroded some. We did grade that up on the actual side of the pad.

Q. As far as the pad in the parking lot, you did not do that?

A. No.

Q. Okay. Now, during this time did you ever push off dirt from the pad to the parking lot?

A. No. I did that to save time and the only reason I did that was to save the church money. . . . Dug some ditches, didn't have any. Had to get ready to pour a slab. . . . a foot below to where the water came up to on the site.

Cherry further testified that during a conversation with Reverend Douglas Cogdell ("Reverend Cogdell"), the senior pastor of White Plains, Reverend Cogdell had expressly given him permission to move the dirt from the foundation to the parking lot.

White Plains offered testimony from Gloria Rogers ("Rogers"), White Plains' administrative assistant, who recounted an occasion on which she had driven by the Church during its construction and observed Cherry moving dirt from the foundation.

Q. You've been sitting in the courtroom for the last two and a half days, Ms. Rogers. You've heard this testimony, I take it, that about dirt being pushed off the mound?

A. Yes, sir.

Q. By Mr. Harrington onto the parking area?

A. Yes, sir.

Q. Separate from that, did you observe Mr. Cherry pushing dirt off the mound?

A. Yes, sir.

Q. Tell me about that.

A. My husband and I we rode by the church every day to see about the progress. And I saw Fred out with his truck, Mr. Cherry out with his truck. And I said, Mr. Cherry, what are you doing? And he says I'm pushing the dirt off of this mound because my men got to have some place to work. Because they say it's too muddy. It was really muddy. So, I've got to push the dirt off the mound. He was in -- in a big truck with the push thing that push [sic] the dirt out in front of it. And he was sitting in the middle of the mountain. As we set there he was pushing around -- he was pushing it systematically around the mound.

Q. Pushing the -- pushing the dirt --

A. Dirt off to the side.

Q. Off to the side.

A. All -- all around, you know, like pushing it around. He said he had to do that because his men needed to come to work and that it was too muddy and they got to get the steel frame up. The building was supposed to be coming in soon.

. . . .

Q. Ms. Rogers, did -- did Mr. Cherry tell you that the reason he was pushing dirt off the mound onto the muddy areas was because his workers told him that the ground was too

- 5 -

muddy for them to work?

A. Yes, sir.

Q. And you -- I think you characterized the piece of machinery that he was atop as a truck with -- with some blade on the front?

A. Yeah, it was a big, you know, truck that you push the dirt off. One of those big things that you push the dirt off with. I guess you use it to push the dirt off. He was pushing the dirt off.

Q. Was it a truck or a tractor?

A. It -- it wasn't a truck like -- it might have been a tractor. It wasn't a -- I don't know what you call it. It was big. It had a thing in the front of it and he as [sic] sitting on it.

Revered Cogdell also testified at trial. He denied ever giving Cherry permission to move dirt from the foundation site to the parking lot area.

Cherry and Harrington both testified that they relied upon the elevation certificate and Jarvis' on-site marking in order to determine how much of the dirt to move off of the foundation site. According to Cherry, Beaufort Builders believed that the foundation had been poured at seven and a half feet above sea level — half a foot above the BFE.

After the pad was poured, construction of the Church continued. When construction was substantially completed, White Plains hired Hood Richardson ("Richardson"), another surveyor, to perform a final evaluation of the building as a prerequisite to being awarded a certificate of occupancy by the county. Richardson's

survey revealed that Jarvis had made an error in his initial calculations. In reality, the actual elevation of the foundation was only at 6.3 feet — approximately 8½ inches below the minimum elevation allowable per the applicable FEMA regulation. As a result, White Plains was unable to obtain a certificate of occupancy for the Church.

Upon failing to receive the certificate of occupancy, White Plains refused to pay Beaufort Builders the outstanding balance owed under the Contract. On 16 November 2012, Beaufort Builders filed a complaint in Beaufort County Superior Court alleging, *inter alia*, that White Plains had breached the Contract by failing to make the remaining payments required thereunder. On 4 February 2013, White Plains filed (1) an answer; (2) counterclaims for breach of contract, breach of implied warranty, and negligence; and (3) a third-party complaint against Cherry individually for negligence.

A jury trial was held before the Honorable Wayland J. Sermons, Jr. beginning on 21 July 2014. At the conclusion of the trial, the jury found that (1) White Plains breached the Contract; (2) Beaufort Builders did not breach the Contract; and (3) White Plains was damaged by the negligence of Cherry.[1] On 14 August 2014, in accordance with the jury's verdict, the trial court entered a judgment awarding (1)

---

[1] It appears from the record that the only liability issues that were actually submitted to the jury were whether (1) White Plains breached the Contract by failing to make the payments provided for in the Contract; (2) Beaufort Builders "provide[d] labor and materials in the building of a church building to [White Plains] under such circumstances that [White Plains] should be required to pay for them"; (3) Beaufort Builders "breach[ed] the contract by failing to build the church building above the base flood elevation"; and (4) White Plains was "damaged by the negligence of . . . Cherry."

Beaufort Builders $70,090.00 in damages for White Plains' breach of contract; and (2) White Plains $57,500.00 in damages for Cherry's negligence.

On 25 August 2014, Cherry filed a motion for judgment notwithstanding the verdict pursuant to Rule 50(b) of the North Carolina Rules of Civil Procedure. On 28 October 2014, the trial court granted Cherry's motion and entered an amended judgment providing, in pertinent part, that "Third-Party Defendant Charles F. Cherry is hereby adjudged to not be liable to Defendant/Third-Party Plaintiff White Plains Church Ministries, Inc. and the claim against Third-Party Defendant Charles F. Cherry is dismissed with prejudice[.]" White Plains filed a timely notice of appeal from the trial court's amended judgment on 25 November 2014.

**Analysis**

White Plains contends that the trial court erred in granting judgment notwithstanding the verdict in favor of Cherry on its third-party claim against him. We disagree.

> On appeal, the standard of review for a judgment notwithstanding the verdict is the same as that for a directed verdict, whereby this Court determines whether the evidence was sufficient to go to the jury. The standard is high for the moving party, as the motion should be denied if there is more than a scintilla of evidence to support the plaintiff's *prima facie* case. The evidence supporting the plaintiff's claims must be taken as true, and all contradictions, conflicts, and inconsistencies must be resolved in the plaintiff's favor, giving the plaintiff the benefit of every reasonable inference.

*Scarborough v. Dillard's, Inc.*, 179 N.C. App. 127, 132, 632 S.E.2d 800, 803-04 (2006) (internal citations and quotation marks omitted). "However, when the evidence is legally insufficient to support a verdict for the prevailing party, and when the question has become one exclusively of law such that the jury has no function to serve, a motion for JNOV may be properly granted." *Primerica Life Ins. Co. v. James Massengill & Sons Const. Co.*, 211 N.C. App. 252, 266-67, 712 S.E.2d 670, 681 (2011) (internal citations, quotation marks, and brackets omitted).

It is well settled that "no negligence claim exists where all rights and remedies have been set forth in [a] contractual relationship." *Williams v. Houses of Distinction, Inc.*, 213 N.C. App. 1, 4, 714 S.E.2d 438, 440 (2011) (citation, quotation marks and brackets omitted); *see Mason v. Yontz*, 102 N.C. App. 817, 818, 403 S.E.2d 536, 538 (1991) ("Generally, a breach of contract does not give rise to damages based on a negligence method of recovery even where the breach was due to negligence or lack of skill." (citation and quotation marks omitted)). This principle is known in our caselaw as the "economic loss rule."

> Simply stated, the economic loss rule prohibits recovery for purely economic loss in tort, as such claims are instead governed by contract law. . . . Thus, the rule encourages contracting parties to allocate risks for economic loss themselves, because the promisee has the best opportunity to bargain for coverage of that risk or of faulty workmanship by the promisor. For that reason, a tort action does not lie against a party to a contract who simply fails to properly perform the terms of the contract, even if that failure to perform was due to the negligent or

> intentional conduct of that party, when the injury resulting from the breach is damage to the subject matter of the contract. It is the law of contract and not the law of negligence which defines the obligations and remedies of the parties in such a situation.

*Lord v. Customized Consulting Specialty, Inc.*, 182 N.C. App. 635, 639, 643 S.E.2d 28, 30-31 (citation and alteration omitted), *disc. review denied*, 361 N.C. 694, 652 S.E.2d 647 (2007).

The economic loss rule was first recognized by our Supreme Court in *N.C. State Ports Authority v. Lloyd A. Fry Roofing Co.*, 294 N.C. 73, 240 S.E.2d 345 (1978). In *Ports Authority*, the plaintiff entered into a contract with Dickerson, Inc. ("Dickerson"), a general contractor, for the construction of two buildings. *Id.* at 81, 240 S.E.2d at 350. However, due to their improper installation, the roofs leaked, resulting in damage to the buildings. As a result, the plaintiff sued Dickerson on theories of breach of contract and negligence. *Id.*

The Supreme Court held that the plaintiff was precluded from bringing an action in negligence against Dickerson, holding that "[o]rdinarily, a breach of contract does not give rise to a tort action by the promisee against the promisor." *Id.* The Court articulated four exceptions to this rule:

> (1) The injury, proximately caused by the promisor's negligent act or omission in the performance of his contract, was an injury to the person or property of someone other than the promisee.
>
> (2) The injury, proximately caused by the promisor's

negligent, or wilful, act or omission in the performance of his contract, was to property of the promisee other than the property which was the subject of the contract, or was a personal injury to the promisee.

(3) The injury, proximately caused by the promisor's negligent, or wilful, act or omission in the performance of his contract, was loss of or damage to the promisee's property, which was the subject of the contract, the promisor being charged by law, as a matter of public policy, with the duty to use care in the safeguarding of the property from harm, as in the case of a common carrier, an innkeeper or other bailee.

(4) The injury so caused was a wilful injury to or a conversion of the property of the promisee, which was the subject of the contract, by the promisor.

*Id.* at 82, 240 S.E.2d at 350-51 (internal citations omitted).

Applying these principles, the Court concluded that none of these exceptions were applicable to the plaintiff's claim against Dickerson.

In the present case, according to the complaint, Dickerson contracted to construct buildings, including roofs thereon, in accordance with agreed plans and specifications. It is alleged that Dickerson did not so construct the roofs. If that be true, it is immaterial whether Dickerson's failure was due to its negligence, or occurred notwithstanding its exercise of great care and skill. In either event, the promisor would be liable in damages. Conversely, if the roofs, as constructed, conformed to the plans and specifications of the contract, the promisor, having fully performed his contract, would not be liable in damages to the plaintiff even though he failed to use the degree of care customarily used in such construction by building contractors. Thus, the allegation of negligence by Dickerson in the second claim for relief set forth in the complaint is surplusage and should be disregarded.

> Consequently, the only basis for recovery against Dickerson, alleged in the complaint, is breach of contract and the Court of Appeals was in error in its view that the complaint "alleges an action in tort" against Dickerson.

*Id.* at 83, 240 S.E.2d at 351.

Since *Ports Authority* was decided, our appellate courts have applied the economic loss rule on a number of occasions to reject analogous negligence claims. *See Williams*, 213 N.C. App. at 6, 714 S.E.2d at 441-42 (economic loss rule precluded negligence claim by homeowners against builder where construction contract set forth available remedies and *Ports Authority* exceptions were inapplicable); *Land v. Tall House Bldg. Co.*, 165 N.C. App. 880, 882-83, 602 S.E.2d 1, 3 (2004) (economic loss rule barred negligence action by homeowners against contractor based on existence of construction contract between the parties); *Kaleel Builders, Inc. v. Ashby*, 161 N.C. App. 34, 42, 587 S.E.2d 470, 476 (2003) ("In accord with the Supreme Court's and our analysis in prior cases, we acknowledge no negligence claim where all rights and remedies have been set forth in the contractual relationship."), *disc. review denied*, 358 N.C. 235, 595 S.E.2d 152 (2004).

We find *Ports Authority* and its progeny controlling here. None of the four exceptions enumerated in *Ports Authority* exist in the present case. Here, the promisee to the contract (White Plains) — rather than a third-party — suffered the injury at issue. Moreover, the injury was to the Church, the subject matter of the Contract. Nor was Beaufort Builders acting as a bailee, a common carrier, or in any

other capacity by which it was charged by law to use due care in order to protect White Plains' property from harm. Finally, there was no evidence suggesting that the injury to the property was willful or that there was a conversion of White Plains' property by Beaufort Builders.

White Plains attempts to escape the applicability of the economic loss rule by arguing that the Contract did not specifically authorize Cherry to move dirt from the site of the foundation to the parking lot. However, White Plains is not contending that through his removal of the dirt Cherry damaged the parking lot area or some other portion of White Plains' property. Rather, the essence of White Plains' third-party claim is that because of his removal of the dirt from the site of the foundation the Church was built below the BFE and, as a result, White Plains was unable to obtain a certificate of occupancy for the building. Thus, the only injury claimed by White Plains as a result of Cherry's actions is directly encompassed within the subject matter of the Contract. *See Spillman v. Am. Homes of Mocksville, Inc.*, 108 N.C. App. 63, 65, 422 S.E.2d 740, 741-42 (1992) ("[A] tort action does not lie against a party to a contract who simply fails to properly perform the terms of the contract, even if that failure to properly perform was due to the negligent or intentional conduct of that party, when the injury resulting from the breach is damage to the subject matter of the contract.").

White Plains relies heavily on our decision in *White v. Collins Bldg., Inc.*, 209 N.C. App. 48, 704 S.E.2d 307 (2011), for the proposition that it is entitled to "pierce the corporate veil" of Beaufort Builders and recover on a claim of negligence against Cherry individually. But *White* is distinguishable on its face because the facts in that case did not trigger the economic loss rule.

In *White*, the plaintiffs purchased a home from a developer, AEA & L, LLC ("AEA"). The home had been constructed by a general contractor — Collins Building, Inc. ("Collins Building") — that had been hired by AEA and with whom the plaintiffs were not in contractual privity. Collins Building's sole shareholder and president was Edwin Collins ("Collins"). *Id.* at 49, 704 S.E.2d at 308. Upon moving into the home, the plaintiffs discovered several defects regarding the installation of the windows and doors as well as the piping, and four of the water pipes in the home later burst, resulting in significant property damage. *Id.* at 49-50, 704 S.E.2d at 308-09.

The plaintiffs brought negligence claims against AEA, Collins Building, Collins individually, and the plumbing subcontractors hired by Collins. *Id.* at 49, 704 S.E.2d at 308. The trial court dismissed the plaintiffs' claim against Collins. *Id.* On appeal, Collins maintained that the plaintiffs could not bring an action in negligence against him individually because "any action that he took was done on behalf of, and as an agent for, Collins Building." *Id.* at 51, 704 S.E.2d at 310.

We reversed the trial court's dismissal of the claim against him, noting that "[i]t is well settled that an individual member of a limited liability company or an officer of a corporation may be individually liable for his or her own torts, including negligence." *Id.* We then recognized that the plaintiffs had alleged Collins oversaw and personally supervised the day-to-day construction of the house. *Id.* at 55-56, 704 S.E.2d at 312. We concluded that these allegations were sufficient to state a claim for negligence against Collins individually, holding that "the potential for corporate liability, in addition to individual liability, does not shield the individual tortfeasor from liability. Rather, it provides the injured party a choice as to which party to hold liable for the tort." *Id.* at 53, 704 S.E.2d at 310 (citation and quotation marks omitted).

Notably, however, we made clear in *White* that our analysis was unaffected by the economic loss rule due to the absence of a contractual relationship between the parties.

> [O]ur Supreme Court has stated that ordinarily, a breach of contract does not give rise to a tort action by the promisee against the promisor. *This analysis is inapplicable in the present case, however, as Plaintiffs are not promisees of a contract with Defendant.*

*Id.* at 59 n. 3, 704 S.E.2d at 314 n. 3 (internal citation, quotation marks, and alteration omitted and emphasis added).

Thus, *White* is wholly consistent with the principle that where contractual privity *does* exist between the parties the promisee is limited to the remedies set forth in the terms of its agreement with the promisor. Here, unlike in *White*, Beaufort Builders and White Plains *were* in contractual privity regarding the construction of the Church.

White Plains nevertheless argues that *White* is, in fact, controlling because its contract was only with Beaufort Builders and that, therefore, no contractual privity existed between itself and *Cherry*. However, this argument ignores the fact that (1) Cherry was the president and co-owner of Beaufort Builders; (2) Cherry's presence at the construction site at all relevant times was due to his company's performance of its contract with White Plains; and (3) all of the acts he undertook while at the site were related to the essential component of Beaufort Builders' contractual obligation to White Plains, which was the construction of the Church. Finally, it bears repeating that the injury White Plains suffered as a result of Cherry's acts was the fact that it did not get the benefit of its bargain with Beaufort Builders — namely, a properly constructed church building that was compliant with all applicable legal requirements so as to render it fit for occupancy and use.

We believe that White Plains' argument, if adopted, would create an impermissible "end run" around the economic loss rule that is inconsistent with the logic underlying that rule. Therefore, we hold that the trial court did not err in

granting Cherry's motion for judgment notwithstanding the verdict as to White Plains' negligence claim against him individually. *See Primerica Life Ins. Co.*, 211 N.C. App. at 267, 712 S.E.2d at 681 ("[T]he trial court properly concluded that [the plaintiff] was entitled to JNOV, and therefore, the trial court's order granting JNOV in favor of [the plaintiff] must be affirmed.").

## Conclusion

For the reasons stated above, we affirm.

AFFIRMED.

Judges STEPHENS and STROUD concur.