IN THE SUPREME COURT OF NORTH CAROLINA

No. 407A19

Filed 18 December 2020

CRESCENT UNIVERSITY CITY VENTURE, LLC

v.

TRUSSWAY MANUFACTURING, INC. and TRUSSWAY MANUFACTURING, LLC

Appeal pursuant to N.C.G.S. § 7A-27(a)(2) from an order and opinion granting summary judgment in favor of defendants entered on 14 August 2019 by Judge Louis A. Bledsoe III, Chief Business Court Judge, in Superior Court, Mecklenburg County, after the case was designated a mandatory complex business case by the Chief Justice pursuant to N.C.G.S. § 7A-45.4(a). Heard in the Supreme Court on 16 June 2020.

*Kiran H. Mehta and William J. Farley III for plaintiff-appellant.*

*Fox Rothschild LLP, by Elizabeth Brooks Scherer and Jeffrey P. MacHarg; and Martyn B. Hill and Michael A. Harris for defendant-appellees.*

MORGAN, Justice.

In this case we must determine whether, under North Carolina law, a commercial property owner who contracts for the construction of a building, and thereby possesses a bargained-for means of recovery against a general contractor, may nevertheless seek to recover in tort for its economic loss from a subcontracted manufacturer of building materials with whom the property owner does not have contractual privity. The Business Court determined that North Carolina's economic

loss rule requires negligence claims to be based upon the violation of an extra-contractual duty imposed by operation of law, simultaneously recognizing that parties generally do not owe each other a duty of care to prevent economic loss. We agree with the Business Court and therefore affirm the Business Court's order granting summary judgment in favor of defendants.

*Factual and Procedural Background*

Plaintiff Crescent University City Venture, LLC (Crescent) was the owner and developer of an initiative to build and lease several student apartment buildings near the campus of the University of North Carolina at Charlotte (the project). In 2012, Crescent entered into a contract with AP Atlantic, Inc. d/b/a Adolfson & Peterson Construction (AP Atlantic), a general contractor, whereby AP Atlantic agreed to construct a multi-building apartment complex on Crescent's property. As a matter of course, AP Atlantic entered into agreements with several subcontractors to facilitate the construction of the project, including a subcontract with Madison Construction Group, Inc. (Madison) for the provision and installation of wood framing for the buildings. The AP Atlantic-Madison subcontract required Madison to procure the floor and roof trusses at issue in the present controversy. The trusses in this context were structures of wood members held together by metal plates bristling with teeth, which were pressed into the pieces of wood at points where they connected at angles, creating a cross-supporting web of triangles. The trusses were delivered

premanufactured to the project site and were each installed as a single piece to make up the floor and roof portions of each apartment building. In order to procure trusses for the project, Madison executed a signed purchase order with Trussway Manufacturing, Inc. (Trussway). The purchase order included the specifications of the trusses required by the project and set forth further terms applicable to the sale of the trusses including an express warranty.

Students of the University of North Carolina at Charlotte began occupying the apartments for the 2014–2015 academic year. Following a party attended by 80–100 people hosted in one of the units of Building C—one of the student apartment buildings erected during the project—on 30 January 2015, the occupants of the unit below reported that their living room ceiling had cracked and was sagging. Crescent relocated the residents of both units in Building C, after which the residents of a unit in Building E reported similar problems on 1 May 2015. Initial inspections revealed that the floor trusses between the apartments in Buildings C and E were defective. Crescent hired an engineering firm, Simpson Gumpertz & Heger, Inc. (SGH), to conduct an investigation into both the identified failures as well as a random sampling of the remaining apartments to determine if the structural defects were isolated or systemic. After examining the apartments with noticeable defects and a wider sample of other apartments, SGH informed Crescent that it believed the floor-truss defects were systemic and pervasive throughout the project. The investigation

revealed that 13.6% of the metal plates connecting the wood members of each truss that SGH inspected had failed or presented an unsafe defect, and reports produced by SGH detailed the repairs necessary to bring the project back to an acceptable standard. While having initially consulted AP Atlantic to conduct the necessary repairs, the parties to this action disagreed about the reasonableness of the proposed timeframe and repair plan Crescent developed with SGH. Crescent instead enlisted the assistance of a third party, Summit Contracting Group, Inc. to complete the planned repairs.

On 5 August 2015, AP Atlantic filed suit against Crescent for outstanding payments on the project, to which Crescent responded with a breach of contract counterclaim on multiple grounds including the defective trusses. Crescent initiated a separate action against AP Atlantic's parent company to enforce a performance guaranty while AP Atlantic maintained multiple derivative claims against the subcontractors on the project, including Trussway. The matter was designated as a complex business case and assigned to the North Carolina Business Court for administration and resolution. The Business Court consolidated the actions on 10 October 2016. Following multiple rounds of pleadings, a lengthy discovery process, and several settlement agreements and voluntary dismissals, the resulting procedural posture led Crescent to move the Business Court to realign the parties, with Crescent as plaintiff, AP Atlantic and its parent company as defendants, and

the subcontractors as third-party and fourth-party defendants. All parties to the consolidated proceedings agreed, and the Business Court granted Crescent's motion on 11 December 2017.

On 12 February 2018, the parties to the consolidated action filed motions for summary judgment, while Crescent filed a complaint asserting a single negligence claim against Trussway, along with a motion to consolidate the new claim with the ongoing matters. Crescent's new complaint alleged that Trussway's negligence in manufacturing the trusses resulted in almost eight million dollars in damages from a combination of the project-wide repairs and stipends to residents for temporary accommodations, transportation, and storage. After this new action was itself designated as a complex business case on 7 March 2018, Trussway filed a motion to dismiss Crescent's new negligence complaint, arguing that the "prior action pending" doctrine barred such a claim. The Business Court held a hearing on the summary judgment motions, Trussway's motion to dismiss the new Crescent action, deemed the "Trussway Action" by the Business Court, and Crescent's motion to consolidate the Trussway Action with the remaining cases on 30 May 2018. In an order dated 16 July 2018, the Business Court denied Trussway's motion to dismiss the Trussway Action and granted Crescent's motion to consolidate. Following this consolidation and denial of its motion to dismiss, Trussway filed an answer to the Trussway Action denying Crescent's negligence allegation and lodging several defenses.

After the conclusion of discovery in the Trussway Action, Trussway filed a motion for summary judgment, arguing that because the duties Trussway allegedly violated as stated in Crescent's newest complaint arose under a contractual relationship—and not by operation of law—Crescent's claims were barred by, *inter alia*, the economic loss rule. A hearing was held before the Business Court on 25 July 2019 during which Trussway specifically argued that Crescent had failed to present sufficient evidence showing the breach of any duty other than the contractual duties contained within the purchase order for the defective trusses with Madison. The Business Court agreed, finding that "[b]ecause Crescent has not alleged or forecast evidence showing the breach of any separate or distinct extra-contractual duty imposed by law, . . . Crescent may not maintain a negligence claim against it." Applying the economic loss rule irrespective of the existence or lack of a contractual relationship between Crescent and Trussway, the court dismissed Crescent's negligence claim with prejudice. We agree with the Business Court's application of the economic loss rule and therefore affirm its order granting summary judgment in favor of Trussway.

*Analysis*

Applying the economic loss rule, North Carolina courts have long refused to recognize claims for breach of contract disguised as the type of negligence claim that Crescent asserted against Trussway in the case before us. *See generally N.C. State*

*Ports Auth. v. Lloyd A. Fry Roofing Co.* (*Ports Authority*), 294 N.C. 73, 240 S.E.2d 345 (1978), *rejected in part on other grounds by Trs. of Rowan Technical Coll. v. J. Hyatt Hammond Assocs., Inc.*, 313 N.C. 230, 328 S.E.2d 274 (1985). Adopted by this Court in *Ports Authority*, the economic loss rule bars recovery in tort by a plaintiff "against a promisor for his simple failure to perform his contract, even though such failure was due to negligence or lack of skill." *Id.* at 83, 240 S.E.2d at 351. *Ports Authority* involved parties which had a relationship posture which is similar to the relationship between Crescent and Trussway in the instant case. In *Ports Authority*, the North Carolina State Ports Authority contracted with a general contractor for the construction of two storage buildings at a site owned and operated by the state agency. *Id.* at 75, 240 S.E.2d at 347. In turn, the general contractor entered into a subcontract with E.L. Scott Roofing Company (E.L. Scott) for the construction of the roofs on both buildings. *Id.* Almost four years after the buildings were completed and occupied by the State Ports Authority, leaks developed in both roofs that necessitated the expensive removal of the equipment and goods stored inside the affected buildings. *Id.* at 75–76, 240 S.E.2d at 347.

The State Ports Authority sued the general contractor in *Ports Authority* for breach of contract based upon the contractor's alleged failure to construct the roofs "in accordance with the plans and specifications" of their agreement. The agency also included in its complaint a second claim that E.L. Scott negligently installed portions

of the roof substructure under the supervision of the general contractor, resulting in the same damages as the general contractor's breach of contract. *Id.* at 81, 240 S.E.2d 350. In addressing the State Ports Authority's negligence claim against E.L. Scott, while the Court noted the existence of appellate case precedent establishing that a promisor to a contract can be held liable in tort for personal or property damage caused by the promisor's negligence, such cases fit into one of four categories, with the common feature among them being the breach of an extra-contractual duty, relationship, or bailment. *Id.* at 81–82, 240 S.E.2d at 350–51. However, this Court recognized that it had never allowed a tort action against a party to a contract "for [its] simple failure to perform [its] contract." *Id.* at 83, 240 S.E.2d at 351. Since that time, North Carolina courts have endeavored to apply the economic-loss-rule instruction of *Ports Authority*. *See Beaufort Builders, Inc. v. White Plains Church Ministries, Inc.* (*Beaufort Builders*), 246 N.C. App. 27, 32–38, 783 S.E.2d 35, 39–42 (2016) (applying the economic loss rule to bar a negligence claim where the denial of a occupancy permit for the contract's subject matter—a church building—constituted the plaintiff's alleged injury); *Window Gang Ventures, Corp. v. Salinas* (*Window Gang*), 2019 NCBC LEXIS 24, at *23–33 (N.C. Super. Ct. Apr. 2, 2019) (analyzing one of four *Ports Authority* exception categories in denying negligence cause of action against defendant based on economic loss rule).

An examination of the Supreme Court of the United States' adoption of the economic loss rule within admiralty law reveals the utility of the rule within its original product-liability context. The Supreme Court of the United States emphasized in *East River S.S. Corp. v. Transamerica Delaval, Inc.* (*East River*), 476 U.S. 858, 866 (1986), that the purpose of the economic loss rule is to prevent "contract law [from] drown[ing] in a sea of tort." *Id.* at 866. In *East River*, a group of tanker ship operators sued the manufacturer of the turbines installed on ships that they had chartered from a shipbuilder after the turbines suffered multiple malfunctions, leading to costly delays in the ongoing businesses of the tanker ship operators. *Id.* at 859–61. In much the same relationship as exists between AP Atlantic and Madison in the case at bar, the shipbuilder had contracted with the manufacturer for the provision and installation of a single part of a larger design/build arrangement. *Id.*

The Supreme Court of the United States grappled with the question of "whether a commercial product injuring itself is the kind of harm against which public policy requires manufacturers to protect, *independent of any contractual obligation.*" *Id.* at 866 (emphasis added). Applying what is now coined as the economic loss rule in denying the tanker ship operators' recovery from the turbine manufacturer, the Supreme Court of the United States held in *East River* that "a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself." *Id.* at 871.

Recognizing that "a commercial situation generally does not involve large disparities in bargaining power," the nation's high court saw "no reason to intrude into the parties' allocation of risk" in reinforcing the operation of the economic loss rule in contractual disputes. *Id.* at 873. Instead, the Supreme Court pointed the tanker ship operators to remedies in warranty, where a plaintiff could enjoy the "full benefit of its bargain" by seeking compensation for expectation damages and "foregone business opportunities," similar to the damages Crescent now attempts to recover from Trussway. *Id.* The economic loss rule has since gained near universal acceptance, and nearly all other state and federal jurisdictions that have applied the rule to commercial transactions—like the transaction involved in the case sub judice—agree that purely economic losses are not recoverable under tort law. *See, e.g., Chicopee, Inc. v. Sims Metal Works, Inc.*, 98 N.C. App. 423, 432, 391 S.E.2d 211, 217 (1990) (citing *2000 Watermark Ass'n, Inc. v. Celotex Corp.*, 784 F.2d 1183, 1185 (4th Cir. 1986)); *see also Kelly v. Georgia-Pacific LLC*, 671 F. Supp. 2d 785, 791 (E.D.N.C. 2009).

Crescent's argument, in construing the Court of Appeals decision in *Lord v. Customized Consulting Specialty, Inc.*, 182 N.C. App. 635, 643 S.E.2d 28 (2007), to represent that the application of the economic loss rule hinges on the existence of a contract between the plaintiff and defendant, is at odds with our holding in *Ports Authority* which is specific to the commercial-development context. To the extent that

such cases as *Lord* spawn an argument against the application of the economic loss rule in commercial cases where a sophisticated commercial developer attempts to recover in tort against a subcontractor when the injury complained of concerns solely the subject matter of a valid contract between the developer and the general contractor, as is the case here, such an argument is unpersuasive. The lack of privity in the commercial context between a developer and a subcontractor, supplier, consultant, or other third party—the potential existence of which is readily known and assimilated in sophisticated construction contracts—is immaterial to the application of the economic loss rule. To this end, *Ports Authority* represents that a lack of contractual privity between 1) a plaintiff who engages in commercial development with a general contractor and 2) a subcontractor, supplier, or other third-party whose relevance to the plaintiff springs from the original contract between the plaintiff and the general contractor does not bar the application of the economic loss rule.

We are well aware of how the intersection between contract law and tort law in North Carolina has developed since *Ports Authority*, as illustrated by Crescent's reliance on *Lord* and this Court's discussion of negligence as a cause of action against residential homebuilders in *Oates v. JAG, Inc.*, 314 N.C. 276, 333 S.E.2d 222 (1985). In *Oates*, this Court addressed the trial court's allowance of a defendant-homebuilder's motion to dismiss for failure to state a claim after the plaintiffs in the

case, who were residential homebuyers who had purchased the subject home from a seller several degrees removed from the defendant builder, had discovered latent defects in the construction of the home. *Id.* at 277–78, 333 S.E.2d at 224. The trial court in *Oates* had granted the defendant-homebuilder's motion to dismiss on the sole ground that plaintiffs could not establish contractual privity with the defendant. *Id.* at 278, 333 S.E.2d at 224. The Court of Appeals affirmed the trial court's order, opining that because the implied warranty of fitness in the construction of homes in North Carolina protected only the initial purchaser in privity of contract with the homebuilder and since the plaintiff was a subsequent purchaser well-removed from contractual privity with the homebuilder, the traditional doctrine of *caveat emptor* applied to bar a cause of action against a homebuilder by a once-removed purchaser. *Id.* at 278–79, 333 S.E.2d at 224.

This Court in *Oates* reversed the decision of the Court of Appeals, determining instead that a subsequent home purchaser in the consumer context could recover against the builder of the home in negligence, even if the purchaser maintained no contractual privity with the builder. *Id.* at 281, 333 S.E.2d at 226. In so holding, this Court adopted the public policy considerations of two Florida intermediate appellate court decisions which both addressed the plight of residential homebuyers who had alleged that their residences suffered from negligent construction on the part of the defendant homebuilders. *Id.* at 279–81, 333 S.E.2d at 225–26 (first quoting *Navajo*

*Circle, Inc. v. Development Concepts Corp.*, 373 So. 2d 689, 691 (Fla. Dist. Ct. App. 1979); then quoting *Simmons v. Owens*, 363 So. 2d 142, 143 (Fla. Dist. Ct. App. 1978)). Crescent cites only this Court's discussion of Florida's *Navajo Circle* case, in arguing that our holding in *Oates* remained consistent with *Ports Authority* in allowing "claims of negligence for those who suffer economic losses or damages from improper construction but who, because not in privity with the builder, have no basis for recovery in contract." *See Warfield v. Hicks*, 91 N.C. App. 1, 10, 370 S.E.2d 689, 694 (1988). We are not inclined to assign such an expansive reading to *Oates* as Crescent urges, especially in light of this Court's further discussion of the *Simmons* case from Florida in *Oates* which reveals the public policy consideration which undergirds the ability of residential homeowners to pursue recovery for deficient construction of their homes on the ground of negligence.

Our holding in *Oates* is a fact-specific response to a problem eloquently recognized by the Florida First District Court of Appeal in *Simmons*.

> We must be realistic. The ordinary purchaser of a home is not qualified to determine when or where a defect exists. Yet, the purchaser makes the biggest and most important investment in his or her life and, more times than not, on a limited budget. The purchaser can ill afford to suddenly find a latent defect in his or her home that completely destroys the family's budget and have no remedy for recourse. This happens too often. The careless work of contractors, who in the past have been insulated from liability, must cease or they must accept financial responsibility for their negligence.

*Oates*, 314 N.C. at 280–81, 333 S.E.2d at 225–26 (quoting *Simmons*, 363 So. 2d at 143). In recognizing the propriety of the Florida court's considerations in *Simmons*, this Court allowed a negligence cause of action in favor of residential homeowners against the distant homebuilders of their homes when the pleadings reflect that the homebuilder's negligent construction of the home constituted the proximate cause of the homeowner's damages. Whether characterized by the Court of Appeals as a refinement of our holdings in *Ports Authority* and *Lord* or as a public policy exception to the economic loss rule for the layperson homeowner, this Court's holding in *Oates* should not be read to disturb the applicability of the economic loss rule to commercial real-estate development transactions.

When a plaintiff asserts that the subject matter of a contract has, in its operation or mere existence, caused injury to itself or failed to perform as bargained for, the damages are merely economic, and a purchaser has no right to assert a claim for negligence against the seller or the product's manufacturer for those economic losses under the economic loss rule. *See East River*, 476 U.S. at 871 (concluding that the economic loss rule imposes no duty upon manufacturers "under either a negligence or strict products-liability theory to prevent a product from injuring itself"); *see also Moore v. Coachmen Indus., Inc.*, 129 N.C. App. 389, 401, 499 S.E.2d 772, 780 (1998). The plaintiff must instead look toward the breach of its contractual relationship with its supplier or general contractor to recover these purely economic

losses. Here, Trussway occupies a position much more akin to the component-parts suppliers in *East River* and *Moore* and the roofing subcontractor in *Ports Authority* as compared to the residential homebuilders in *Oates*. Crescent negotiated with AP Atlantic for the construction of a number of student apartment buildings with the full knowledge of and power to control the acquisition and engagement of subcontractors for the various roles within the greater construction scheme. We are constrained by the well-established origins and ongoing application of the economic loss rule in North Carolina from affording Crescent, a sophisticated, commercial developer, the same extra-contractual remedies afforded residential homeowners by reason of public policy.

## *Conclusion*

North Carolina's state courts have consistently applied the economic loss rule to hold that purely economic losses are not recoverable under tort law, particularly in the context of commercial transactions. The Business Court was correct in its interpretation and application of this Court's decision in *Ports Authority*. Therefore, we affirm the Business Court's allowance of defendant's motion for summary judgment.

AFFIRMED.