IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA19-283

Filed: 3 March 2020

Brunswick County, No. 15-CVS-1616

JAMES CUMMINGS and wife, CONNIE CUMMINGS, Plaintiffs,

v.

ROBERT PATTON CARROLL; DHR SALES CORP. d/b/a RE/MAX COMMUNITY
BROKERS; DAVID H. ROOS; MARGARET N. SINGER; BERKELEY INVESTORS,
LLC; KIM BERKELEY T. DURHAM; GEORGE C. BELL; THORNLEY HOLDINGS,
LLC; BROOKE ELIZABETH RUDD-GAGLIE f/k/a BROOKE ELIZABETH RUDD;
MARGARET RUDD & ASSOCIATES, INC. and JAMES C. GOODMAN, Defendants.


Appeal by Plaintiffs from order entered 31 July 2018 by Judge Alma L. Hinton

in Brunswick County Superior Court. Heard in the Court of Appeals 17 October 2019.

*Chleborowicz Law Firm, PLLC, by Christopher A. Chleborowicz and Elijah
A.T. Huston, for Plaintiffs-Appellants.*

*Ward and Smith, P.A., by Ryal W. Tayloe and Alex C. Dale, for Defendants-
Appellees Berkeley Investors, LLC, and George C. Bell.*

*Crossley McIntosh Collier Hanley & Edes, PLLC, by Clay Allen Collier, for
Defendants-Appellees Robert Patton Carroll and DHR Sales Corp. d/b/a
Re/Max Community Brokers.*

*Wallace, Morris, Barwick, Landis & Stroud, P.A., by Stuart L. Stroud and
Kimberly Connor Benton, for Defendants-Appellees Brooke Elizabeth Rudd-
Gaglie f/k/a Brooke Elizabeth Rudd, Margaret Rudd & Associates, Inc., and
James C. Goodman.*

COLLINS, Judge.

Plaintiffs James and Connie Cummings appeal from the trial court's 31 July 2018 order granting summary judgment to Defendants Berkeley Investors, LLC, George C. Bell, Robert Patton Carroll, DHR Sales Corp. d/b/a Re/Max Community Brokers, Brooke Elizabeth Rudd-Gaglie f/k/a Brooke Elizabeth Rudd, Margaret Rudd & Associates, Inc., and James C. Goodman (collectively, "Defendants"[1]). Plaintiffs contend that material issues of fact exist that preclude summary judgment. We affirm in part and reverse and remand in part.

## I.     Background

In August 2014, Plaintiffs purchased a house located on Oak Island (the "House") from Berkeley Investors, LLC ("Berkeley"). Plaintiffs were represented in the transaction by Margaret Rudd & Associates, Inc., (the "Rudd Agency"), and the Rudd Agency's agents Brooke Rudd-Gaglie and James Goodman. Berkeley was represented in the transaction by DHR Sales Corp. d/b/a Re/Max Community Brokers ("Re/Max") and Robert Carroll, Re/Max's agent in charge of listing the House. At all times relevant to this litigation, George Bell owned a fifty-percent interest in Berkeley, and Thornley Holdings, LLC, an entity owned by Kim Durham, owned the other fifty-percent interest.

---

[1] Although they were initially named as defendants, David H. Roos, Margaret N. Singer, Kim Berkeley T. Durham, and Thornley Holdings, LLC were voluntarily dismissed by Plaintiffs prior to entry of the trial court's order from which Plaintiffs have appealed.

The House was constructed in 2003. Berkeley purchased the House in 2005, intending to use it as a rental property. Over the course of its ownership of the House, Berkeley employed Oak Island Accommodations, Inc., ("OIA") to manage the House's rental, cleaning, and maintenance. OIA records demonstrate that over the course of Berkeley's ownership of the House, there were various reports about problems at the House requiring maintenance including, *inter alia*, damage to the roof, windows which would not close, various internal leaks, mold and other "foreign substances" growing within, and pests.

Berkeley first hired Carroll to list the House for sale in January 2013. On 14 January 2013 (Durham's signature) and 20 January 2013 (Bell's signature), Berkeley executed a State of North Carolina Residential Property and Owners' Association Disclosure Statement (the "Disclosure Statement"), which owners of certain residential real estate are required to provide to prospective purchasers in connection with a contemplated sale pursuant to N.C. Gen. Stat. § 47E. In the Disclosure Statement, Berkeley (through Durham and Bell) marked "No" in response to the following questions:

> Regarding the [House] . . . to your knowledge is there any problem (malfunction or defect) with any of the following:
>
> . . . .
>
> (1) FOUNDATION, SLAB, FIREPLACES/CHIMNEYS, FLOORS, WINDOWS (INCLUDING STORM WINDOWS AND SCREENS), DOORS, CEILINGS, INTERIOR AND EXTERIOR WALLS, ATTACHED GARAGE, PATIO, DESK OR OTHER STRUCTURAL COMPONENTS

including any modifications to them? . . .

(2) ROOF (leakage or other problem)? . . .

(3) WATER SEEPAGE, LEAKAGE, DAMPNESS OR STANDING WATER in the basement, crawl space or slab? . . . .

(4) PRESENT INFESTATION, OR DAMAGE FROM PAST INFESTATION OF WOOD DESTROYING INSECTS OR ORGANISMS which has not been repaired?"

The "Instructions to Property Owners" section of the Disclosure Statement sets forth that marking "No" on the form is a representation that the signatory has "no actual knowledge of any problem" regarding the relevant characteristic or condition at the time of signing. The instructions also charged Berkeley that if "something happens to the property to make your Disclosure Statement incorrect or inaccurate (for example, the roof begins to leak), you must promptly give the purchaser a corrected Disclosure Statement or correct the problem."

Evidence in the record shows that Bell and Durham discussed various issues with the House during Berkeley's ownership including, *inter alia*, mold, various water leaks, and ceiling leaks. Carroll was also party to certain of these communications, including a 14 October 2013 email regarding issues with the House between Carroll, Bell, and Durham, among others, in which Bell said they needed to "trace the source of the water leakage evident on the ceiling" and "[f]ix the separated/rotted wood in the guest room level from the water leakage. (it leaked while we were there last week and it looks as though the water may be coming in through the half moon window on

the upper floor[,)]" and that he had "[f]ound a small plumbing leak in the kitchen" which he had "fixed with tape."

On 20 January 2014, Bell sent Durham an email noting that they needed to: (1) paint the exterior walls and the trim around the doors, as "the wooden trim around the doors is in real danger of beginning to rot"; (2) paint the "living area on the lower level" because "[t]here has been a lot of water intrusion that has come into that ceiling from wind driven rain from above and has stained it badly about 15 feet into the room ceiling. It's right in the center of the room and seems to originate on the upper level and flow down through the interior column between the doors"; and (3) "[f]ind and repair the source of this leak that is causing the damage. We'll need to get a few boards replaced on the columns as well; they are buckled from the water intrusion." OIA records from 13 February 2014 entitled "Work for Owner" indicate that OIA was seeking estimates to repair these issues, and indicated on 25 March 2014: "Owner is having this work completed by another vendor."

Carroll hired a painter named Randy Cribb to paint the house at some point in March 2014. In addition to painting a wall, the upper and lower decks, and the living room, the work Cribb bid included repairing "cracks" and "cracked caulk" in the living room ceiling. The record contains a screenshot of text messages exchanged between Carroll and Cribb at an unspecified date prior to 24 March 2014 in which Cribb said "I may have found that leak . . . I hope that was it. Everything else there

is tight[.]"  In his deposition, Cribb testified that he did not look behind any walls to check for sources of water intrusion.

The Rudd Agency began representing Plaintiffs in their efforts to purchase the House on 26 June 2014, when Rudd-Gaglie (on the agency's behalf) and Plaintiffs executed an Exclusive Buyer Agency Agreement.  That agreement set forth, *inter alia*, that: (1) the Rudd Agency had the duty of "disclosing to [Plaintiffs] all material facts related to the property or concerning the transaction of which [the Rudd Agency] has actual knowledge"; (2) Plaintiffs "[are] advised to seek other professional advice in matters of . . . surveying, wood-destroying insect infestation, structural soundness, engineering, and other matters pertaining to any proposed transaction"; and (3) while the Rudd Agency "may provide [Plaintiffs] the names of providers who claim to perform such services, [Plaintiffs] understand[] that [the Rudd Agency] cannot guarantee the quality of service or level of expertise of any such provider."  The Exclusive Buyer Agency Agreement also provided that Plaintiffs agreed to "indemnify and hold [] harmless" the Rudd Agency (and its agents Rudd-Gaglie and Goodman) for any liability it might incur arising "either as a result of [Plaintiffs'] selection and use of any such provider or [Plaintiffs'] election not to have one or more of such services performed."

Berkeley accepted Plaintiffs' offer to purchase the House for $1.25 million on 12 (Plaintiffs' and Bell's signatures) and 13 July 2014 (Durham's signature).  The

Offer to Purchase and Contract (the "Contract") contemplated a 30-day due diligence period allowing Plaintiffs and their agents "to conduct all desired tests, surveys, appraisals, investigations, examinations and inspections of the Property as [Plaintiffs] deem[] appropriate," without limitation, and expressly contemplated that Plaintiffs were allowed to conduct "[i]nspections to determine . . . the presence of . . . evidence of excessive moisture adversely affecting any improvements on the Property" or "evidence of wood-destroying insects or damage therefrom[.]" The Contract also: (1) included an acknowledgment by Plaintiffs that they had received the Disclosure Statement (which, as mentioned above, Berkeley had executed in January 2013); (2) included an acknowledgement by Plaintiffs that "THE PROPERTY IS BEING SOLD IN ITS CURRENT CONDITION"; and (3) set forth that Berkeley was not providing Plaintiffs any warranty to Plaintiffs in connection with the sale.

Plaintiffs hired Jeff Williams, a licensed home inspector, to conduct an inspection of the House on 19 July 2014, which Carroll, Rudd-Gaglie, and Goodman also attended. In the inspection report he provided to Rudd-Gaglie (to be provided to Plaintiffs), Williams set forth the scope of his inspection, including that he "shall[,]" *inter alia*: (1) "[r]eport signs of abnormal or harmful water penetration into the building or signs of abnormal or harmful condensation on building components"; and (2) "[p]robe structural components where deterioration is suspected[.]" But the

Williams report also set forth that: (1) "[t]he inspection did not involve . . . inspecting behind furniture, area rugs or areas obstructed from view"; (2) Williams was "not required to: [e]nter any area or perform any procedure that may damage the property or its components" or "[d]isturb insulation, move personal items, panels, furniture, equipment, plant life, soil, snow, ice, or debris that obstructs access or visibility"; (3) Williams was not required to "report on . . . [t]he presence or absence of pests such as wood damaging organisms, rodents, or insects"; and (4) "[w]hile the inspector makes every effort to find all areas of concern, some areas can go unnoticed[.] Our inspection makes an attempt to find a leak but sometimes cannot. . . . It is recommended that qualified contractors be used in your further inspection or repair issues as it relates to the comments in this inspection report."

The Williams report noted a variety of issues with the House requiring repairs, including, *inter alia*: (1) minor damage to the roof; (2) areas on the exterior of the House needing "to be sealed to keep water and insect [sic] from entering the home"; (3) doors that failed to close or otherwise seal properly; (4) windows that exhibited rust stains and would not open; and (5) minor leaks causing mold to grow. Williams did not report that the House exhibited significant water-intrusion issues. At his deposition, Williams testified that he did not see any evidence of moisture intrusion during his inspection of the House, and therefore did not conduct any moisture testing, which would have involved intruding behind the walls. Williams also

testified that he was not made aware of any history of water intrusion, which would have caused him to either conduct moisture testing or turn down the job. James Cummings ("Cummings") testified at his deposition that following Williams' inspection, he asked Carroll: "Is this a good, watertight, sound house?" and that Carroll responded "Jim, if I had the money, I'd buy it."

Rudd-Gaglie sent Plaintiffs the Williams report via email on 21 July 2014. In her email, Rudd-Gaglie said that Williams had told her the issues included "mostly small items" and that "the bigger items were the doors and windows[,]" and said that she and Plaintiffs should review the report in-depth and then "discuss how [Plaintiffs] would like to proceed with repairs."

On 11 August 2014 (Bell's signature) and 12 August 2014 (Durham's signature), Berkeley and Plaintiffs amended the Contract to require Berkeley to pay $4,500 of Plaintiffs' "expenses associated with the purchase of the Property[.]" Cummings testified at his deposition that the amendment was intended to compensate Plaintiffs for the cost of repairing the issues identified by Williams during his inspection, primarily replacing certain door locks and window cranks. The transaction closed on 15 August 2014.

Cummings testified that Plaintiffs and their family went to the House for Thanksgiving in 2014. Just before the holiday, there was a storm, and water began entering the House from the first-floor ceiling. Cummings and his son-in-law cut

away a section of the wall with a knife, and noticed a nest of termites and mold. Cummings then called Rudd-Gaglie and apprised her of the problem. Rudd-Gaglie suggested Cummings call Craig Moore, a licensed general contractor, to come to inspect the House, and Cummings did so.

At his deposition, Moore testified that upon his first visit to the House soon thereafter, the ocean-side wall showed signs of flooding and "massive rot," which he testified was a "structural issue" that would have "take[n] quite a while" to develop. Moore also testified that he witnessed an active termite infestation causing damage to the House, and that in his experience such damage "doesn't happen in a couple of days."

Moore testified that the damage he witnessed showed that, in his opinion, the House had not been properly maintained, although "work had been done to make the house look better[,]" i.e., that the "previous damage to the house, wherever it was, was carefully painted and hidden so that the only way to discover that there was an ongoing water intrusion problem would have been to do extensive intrusion testing into the walls[.]" Moore also disagreed that "there [would] have been any reason for you if you went and looked at this house to cut a hole in the wall before you bought it to do intrusive testing[,]" although Moore testified that he would have identified the water-intrusion issues had he inspected the House for Plaintiffs, and told Plaintiffs

that "this is why you should have a general contractor do your inspection instead of a home inspector because [general contractors] know what the repairs look like."

Moore testified that he did not believe that someone performing aesthetic work could have done their job without suspecting that they were covering up a major problem, but expressed his opinion that "[t]here would be no way to tell the extent of the condition without exposing the framing of the house," i.e., conducting moisture testing by intruding into the walls. Later, once the interior sheetrock walls were removed, Moore observed extensive moisture intrusion and rot, and that there had been newspaper shoved into holes in the walls and then caulked over. Moore ultimately contracted with Plaintiffs to repair much of the damage he found.

Plaintiffs initially filed suit in this case on 2 September 2015. The trial court subsequently granted Plaintiffs' motion to amend the complaint, which was filed on 12 September 2016. Plaintiffs' amended complaint brought the following causes of action against Defendants:[2] (1) negligence, against Re/Max, Carroll, the Rudd Agency, Rudd-Gaglie, and Goodman; (2) negligent misrepresentation, against all Defendants; (3) breach of fiduciary duty, against the Rudd Agency, Rudd-Gaglie, and Goodman; (4) unfair and deceptive trade practices within the meaning of N.C. Gen. Stat. § 75-1.1, against Berkeley, Bell, Re/Max, and Carroll; (5) breach of contract,

---

[2] Plaintiff's amended complaint also brought causes of action against the voluntarily dismissed defendants, *see supra* note 1, which are not relevant for purposes of this appeal.

against Berkeley and Bell; (6) breach of the implied covenant of good faith and fair dealing, against Berkeley and Bell; (7) fraud and fraud in the inducement, against Berkeley, Bell, Re/Max, and Carroll; (8) fraud by concealment, against Berkeley, Bell, Re/Max, and Carroll; and (9) personal liability against Bell.  In their amended complaint, Plaintiffs alleged that Defendants facilitated their purchase of the House in a defective condition—namely, that the House was damaged by undisclosed water-intrusion issues and was infested with termites—in derogation of various duties, and sought damages.

Defendants answered the amended complaint, asserted various affirmative defenses, and moved to dismiss on 18 October 2016, 14 November 2016, and 30 November 2016.  Discovery ensued, after which Defendants moved for summary judgment pursuant to N.C. Gen. Stat. § 1A-1, Rule 56, on 24 May 2018 and 31 May 2018.

Defendants' motions for summary judgment came on for hearing on 11 June 2018.[3]  On 12 July 2018, the trial court emailed counsel for the parties indicating that she intended to grant Defendants' motions for summary judgment on all of Plaintiffs'

---

[3] During the hearing, Berkeley and Bell's counsel objected to Plaintiffs' reliance upon a document reflecting OIA maintenance records for the House from 2005 to 2010 on the basis that the document had not been authenticated in any deposition, and the trial court overruled the objection. The purportedly unauthenticated records—which Berkeley and Bell urge in their brief on appeal that we not consider in reviewing the trial court's order—are not material to our conclusions regarding whether summary judgment was appropriately granted on Plaintiffs' various causes of action, and we therefore need not analyze the trial court's ruling on Berkeley and Bell's objection to those records.

causes of action, and requested that counsel prepare proposed orders reflecting that ruling, as well as various findings of fact she said the proposed orders "should include[.]" The parties responded with various proposed orders over the next week, and suggested to the trial court that findings of fact were not necessary.

On 31 July 2018, the trial court entered an order granting Defendants' motions for summary judgment on all of Plaintiffs' causes of action, without any findings of fact. The trial court dismissed Plaintiffs' causes of action with prejudice and taxed Plaintiffs with costs.

Plaintiffs timely noticed appeal from the 31 July 2018 order.[4]

## II.    Discussion

Plaintiffs argue that the trial court erred by granting Defendants summary judgment because genuine issues of material fact exist that require trial. After stating the standard of review, we address each of Plaintiffs' causes of action in turn.

### a.    Standard of Review

This Court has said:

> Summary judgment is a somewhat drastic remedy, that
> must be used with due regard to its purposes and a
> cautious observance of its requirements in order that no

---

[4] In their notice of appeal, Plaintiffs also purported to appeal from the trial court's ruling sustaining Berkeley and Bell's objection to the introduction of certain evidence at the hearing on Defendants' motions for summary judgment. However, Plaintiffs make no arguments regarding that ruling in their brief on appeal, and as such, that aspect of Plaintiffs' appeal has been abandoned. N.C. R. App. P. 28(b)(6) ("Issues not presented in a party's brief, or in support of which no reason or argument is stated, will be taken as abandoned.").

person shall be deprived of a trial on a genuine disputed factual issue. The purpose of summary judgment is to eliminate formal trials where only questions of law are involved by permitting penetration of an unfounded claim or defense in advance of trial and allowing summary disposition for either party when a fatal weakness in the claim or defense is exposed.

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law. The party moving for summary judgment ultimately has the burden of establishing the lack of any triable issue of fact.

A defendant may show entitlement to summary judgment by

 (1) proving that an essential element of the plaintiff's case is non-existent, or

 (2) showing through discovery that the plaintiff cannot produce evidence to support an essential element of his or her claim, or

 (3) showing that the plaintiff cannot surmount an affirmative defense.

Summary judgment is not appropriate where matters of credibility and determining the weight of the evidence exist. Once the party seeking summary judgment makes the required showing, the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a prima facie case at trial. To hold otherwise . . . would be to allow plaintiffs to rest on their pleadings, effectively neutralizing the useful and efficient procedural tool of summary judgment.

*Draughon v. Harnett Cty. Bd. of Educ.*, 158 N.C. App. 208, 211-12, 580 S.E.2d 732, 735 (2003) (internal quotation marks, brackets, and citations omitted).

"Our standard of review of an appeal from summary judgment is de novo. The evidence produced by the parties is viewed in the light most favorable to the non-moving party. If the evidentiary materials filed by the parties indicate that a genuine issue of material fact does exist, the motion for summary judgment must be denied." *Nationstar Mortg. LLC v. Curry*, 822 S.E.2d 122, 125-26 (N.C. Ct. App. 2018) (internal quotation marks, brackets, and citations omitted).

### b.       Negligence

"[U]nder established common law negligence principles, a plaintiff must offer evidence of four essential elements in order to prevail: duty, breach of duty, proximate cause, and damages." *Estate of Mullis v. Monroe Oil Co.*, 349 N.C. 196, 201, 505 S.E.2d 131, 135 (1998).

Plaintiffs brought their negligence cause of action against Re/Max and Carroll (collectively, "Berkeley's agents") and the Rudd Agency, Rudd-Gaglie, and Goodman (collectively, "Plaintiffs' agents"), and we address these two groups separately.

### 1.      *Berkeley's agents*

Plaintiffs alleged that Berkeley's agents owed them duties to, *inter alia*: (1) "take all reasonable steps to ascertain all known and readily available material facts about the condition" of the House, including by making inquiries of Berkeley,

OIA, and their representatives regarding the House, and to disclose all known and ascertainable material facts regarding the House to Plaintiffs; (2) ensure that the water-intrusion issues at the House were effectively repaired by a proper professional; and (3) ensure that Berkeley's Disclosure Statement was materially accurate and fully disclosed any material defects to the House before providing the same to Plaintiffs. Plaintiffs alleged that Berkeley's agents breached those duties by: (1) failing to discover any ascertainable material defects to the House and disclose those defects to them; (2) hiring Cribb, a painter, to repair the water-intrusion issues; (3) allowing Berkeley to provide Plaintiffs with the Disclosure Statement in which Berkeley represented that it had no actual knowledge of defects to the House; and (4) failing to disclose the known history of water-intrusion issues at the House and any other known material facts about the House to them. Berkeley's agents' alleged negligence was a proximate cause of Plaintiffs closing on the House, the theory continues, which caused Plaintiffs injury when they repaired the defects to the House once they were discovered, and resulted in other damages.

We have described the duties a seller's agent owes to the buyer in a real-estate transaction as follows:

> It is well-settled that a broker who makes fraudulent misrepresentations or who conceals a material fact when there is a duty to speak to a prospective purchaser in connection with the sale of the principal's property is personally liable to the purchaser notwithstanding that the broker was acting in the capacity of agent for the seller.

> Further, *a broker has a duty not to conceal from the purchasers any material facts and to make full and open disclosure of all such information. This duty applies, however, to material facts known to the broker and to representations made by the broker.*

*Clouse v. Gordon*, 115 N.C. App. 500, 508, 445 S.E.2d 428, 432-33 (1994) (emphasis added) (internal quotation marks, brackets, and citations omitted).

First, Plaintiffs' theory that Berkeley's agents were negligent because they failed to discover defects and disclose "ascertainable" material facts is misguided, because a seller's agent only has a duty to disclose material facts that are known to him. *Id.* Second, Berkeley's agents could not have become liable in negligence to Plaintiffs by failing to ensure that proper repair work at the House took place, because Berkeley's agents owed Plaintiffs no duty to ensure that the House was in any particular condition at the time of closing. And third, Berkeley's agents were not negligent by merely passing along Berkeley's Disclosure Statement to Plaintiffs, where the Disclosure Statement (1) was not signed by Berkeley's agents, (2) expressly set forth that "the representations are made by the owner and not the owner's agent(s) or subagent(s)[,]" and (3) only set forth representations regarding Berkeley's (and its representatives') actual knowledge. Plaintiffs have not directed our attention to any authority setting forth that a seller's agent has a duty to challenge or correct the statements made by its principal to a prospective buyer under such circumstances, and we are aware of no such authority.

However, the facts that Berkeley's agents owed Plaintiffs no duties to discover defects at the House, repair the House, or correct the Disclosure Statement does not mean that Berkeley's agents owed no duty to Plaintiffs to speak regarding the water-intrusion issues at the House, the circumstances surrounding Cribb's purported repair work to those issues, or the substance of Berkeley's Disclosure Statement, of which the record demonstrates Berkeley's agents had knowledge. As mentioned above, "a broker has a duty not to conceal from the purchasers any material facts and to make full and open disclosure of all such information." *Clouse*, 115 N.C. App. at 508, 445 S.E.2d at 432-33. Berkeley's agents do not dispute that they did not tell Plaintiffs about the previous water-intrusion issues or the circumstances surrounding Cribb's purported repairs, and so the question is whether those facts were material such that Berkeley's agents were required to disclose them, and were negligent by failing to do so.

The materiality of the past water-intrusion issues and Cribb's purported repairs to them depends upon whether Cribb's work was sufficient to justify a reasonable belief that the issues had been successfully repaired,[5] and thus that the

---

[5] *See* 2008-2009 Update Course, "Material Facts" 28 (N.C. Real Estate Comm'n, 2009), https://www.ncrec.gov/Pdfs/bicar/MaterialFacts.pdf ("Where the broker is reasonably certain that the repair was successful and cured the problem, then it may not need to be disclosed, such as a leaky faucet which has been fixed, or the purchase of a new water heater to replace the old one, etc."); *see also Friebel v. Paradise Shores of Bay Cty., LLC*, 2012 U.S. Dist. LEXIS 36384, at *9 (N.D. Fla. Mar. 19, 2012) ("Here, the only issue is whether the structural problems and the subsequent repairs were material facts which should have been disclosed. . . . Plaintiffs have not met their burden because the evidence in the record demonstrates that Defendant was reasonable in relying on the assurances of

facts of the issues and the repairs—which would be material in the absence of successful repairs—were rendered no longer material such that the failure to disclose them to Plaintiffs was not negligence (or fraud, *see infra* Section II(h)).  Because none of the Defendants have directed our attention to any authority tending to support the proposition that where a painter states that he "may have found" a leak at a residence and "hope[s]" that he repaired it, the facts of the previous water-intrusion issues at the residence and the efforts that were undertaken to repair them are rendered immaterial as a matter of law, we conclude that the question of the materiality of those facts must be answered by a jury following trial.  *See Latta v. Rainey*, 202 N.C. App. 587, 599, 689 S.E.2d 898, 909 (2010) ("A misrepresentation or omission is 'material' if, had it been known to the party, it would have influenced the party's judgment or decision to act.  Materiality is generally a question of fact for the jury." (citations omitted)).

Berkeley's agents argue, however, that the economic-loss rule bars Plaintiffs' negligence cause of action against them.  This Court has explained the economic-loss rule as follows:

> [A] tort action does not lie against a party to a contract who simply fails to properly perform the terms of the contract,

---

the engineer of record, the architect, their retained certified general contractor, the engineers at ECM, and the city issued certificate of occupancy. . . . Defendants were reasonable to believe that the repairs were adequate and that no disclosures had to be made."); *cf. Clouse*, 115 N.C. App. at 509, 445 S.E.2d at 433 (defendant "would have no reason to question [surveyor]'s affirmative representation and make her own independent investigation when [surveyor]'s expertise was specifically in the area of conducting surveys and when he was paid to specifically conduct such survey").

> even if that failure to perform was due to the negligent or intentional conduct of that party, when the injury resulting from the breach is damage to the subject matter of the contract. It is the law of contract and not the law of negligence which defines the obligations and remedies of the parties in such a situation. Where parties were privy to a contract, a viable tort action must be grounded on a violation of a duty imposed by operation of law, and the right invaded must be one that the law provides without regard to the contractual relationship of the parties, rather than one based on an agreement between the parties.

*Boone Ford, Inc. v. IME Scheduler, Inc.*, 822 S.E.2d 95, 99 (N.C. Ct. App. 2018) (internal quotation marks and citations omitted).

However, Berkeley's agents did not have direct contractual privity with Plaintiffs. And as described below in Section II(f), we conclude that Berkeley's Contract with Plaintiffs did not impose a contractual duty upon Berkeley (or others) to (1) discover defects to the House and disclose them to Plaintiffs, (2) repair any known defects to the House for Plaintiffs, or (3) provide a Disclosure Statement free from misrepresentations to Plaintiffs, meaning that such alleged acts and omissions by Berkeley's agents could not breach the Contract. It follows, therefore, that the economic-loss rule is not applicable to Plaintiffs' negligence cause of action brought against Berkeley's agents: i.e., because neither Berkeley, Bell, nor Berkeley's agents are adequately alleged to have acted or failed to act in a way implicating any *contractual* duties Berkeley owed to Plaintiffs under the Contract—namely, to sell the House to Plaintiffs "IN ITS CURRENT CONDITION"—the economic-loss rule

cannot bar Plaintiffs' causes of action alleged *in tort* against Berkeley, Bell, or Berkeley's agents.

For these reasons, we conclude that the trial court erred by granting Berkeley's agents summary judgment on the negligence cause of action Plaintiffs brought against them.

### 2. *Plaintiffs' agents*

Plaintiffs alleged that Plaintiffs' agents had duties to: (1) discover material defects to the House, including the water-intrusion issues, and to disclose those defects to them; and (2) make proper recommendations regarding home inspectors. Plaintiffs alleged that Plaintiffs' agents breached those duties by (1) failing to discover and disclose the water-intrusion issues and (2) negligently recommending Williams, who did not perform moisture testing.

However, the scope of Plaintiffs' agents' duties which Plaintiffs alleged were breached were bargained for and set forth within the Exclusive Buyer Agency Agreement that the Rudd Agency executed with Plaintiffs, and Plaintiffs have not argued that the Exclusive Buyer Agency Agreement, or any term therein, was invalid. *See Andrews v. Fitzgerald*, 823 F. Supp. 356, 378 (M.D.N.C. 1993) (upholding exculpatory clause in contract for the sale of securities: "Under North Carolina law, parties to a contract may agree to limit liability for ordinary negligence. Exculpatory provisions are not favored by the law and are strictly construed against parties

relying on them. Exculpatory clauses will be held void if the agreement is (1) violative of a statute, (2) contrary to a substantial public interest, or (3) gained through inequality of bargaining power." (citations omitted)). Because Plaintiffs agreed to limit the scope of Plaintiffs' agents' duties within a valid contract, Plaintiffs' negligence cause of action against Plaintiffs' agents is barred by the economic-loss rule.[6] *See Lord v. Customized Consulting Specialty, Inc.*, 182 N.C. App. 635, 639, 643 S.E.2d 28, 30 (2007) (in the products-liability context, noting that the economic-loss rule "encourages contracting parties to allocate risks for economic loss themselves, because the promisee has the best opportunity to bargain for coverage of that risk or of faulty workmanship by the promisor").

The Exclusive Buyer Agency Agreement specifically (1) described the Rudd Agency's duties regarding the disclosure of material facts about the House, (2) advised Plaintiffs to seek professional advice regarding inspections of the House, and (3) set forth that Plaintiffs understood that the Rudd Agency was not responsible for the quality of services provided by any professionals it recommended to Plaintiffs. Accordingly, because Plaintiffs are in privity of contract with the Rudd Agency

---

[6] The fact that Plaintiffs did not bring a breach-of-contract claim against Plaintiffs' agents in the amended complaint does control the application of the economic-loss rule here, as a holding to that effect would create an avenue by which litigants could effectively avoid the effect of bargained-for contractual terms where unfavorable by simply not bringing a claim for breach of contract and suing their counterparty in tort instead.

regarding the bases for the negligence cause of action Plaintiffs brought against the Rudd Agency, that cause of action is barred by the economic-loss rule.

Moreover, although Rudd-Gaglie and Goodman were not parties to the Exclusive Buyer Agency Agreement and therefore lacked privity of contract with Plaintiffs, we have held that the economic-loss rule bars negligence actions brought against a defendant acting on behalf of another with whom the plaintiff was in contractual privity where the defendant's acts and the harm suffered by the plaintiff were related to the essence of the contract. *See Beaufort Builders, Inc. v. White Plains Church Ministries, Inc.*, 246 N.C. App. 27, 37-38. 783 S.E.2d 35, 42 (2016) (rejecting the plaintiff's argument that the president/co-owner could not avail himself of the economic-loss rule because he lacked contractual privity with the plaintiff, who had contracted with the construction company, rather than the president/co-owner in his individual capacity).

So here, where Rudd-Gaglie and Goodman's purported negligence in discovering and disclosing the purported defects to the House to Plaintiffs was clearly related to the essence of the Rudd Agency's contract with Plaintiffs to represent them in their efforts to purchase the House, and the harm Plaintiffs allegedly suffered was that they did not get the benefit of their bargain with the Rudd Agency, Plaintiffs may not avoid the application of the economic-loss rule to its claims against Rudd-Gaglie and Goodman in their individual capacities.

We accordingly conclude that the trial court did not err by granting Plaintiffs' agents summary judgment on the negligence cause of action Plaintiffs brought against them.

c.    Negligent misrepresentation

This Court has said:

> The tort of negligent misrepresentation occurs when a party [1] justifiably relies [2] to his detriment [3] on information prepared without reasonable care [4] by one who owed the relying party a duty of care. If the plaintiff could have discovered the truth upon inquiry, the complaint must allege that he was denied the opportunity to investigate or that he could not have learned the true facts by exercise of reasonable diligence.

*Songwooyarn Trading Co. v. Sox Eleven, Inc.*, 213 N.C. App. 49, 54, 714 S.E.2d 162, 166 (2011) (internal quotation marks and citations omitted).

Plaintiffs brought their cause of action for negligent misrepresentation against all Defendants, alleging that Defendants breached their duties to discover and disclose material defects to the House to Plaintiffs, and that Plaintiffs justifiably relied to their detriment upon Defendants' representations that did not include disclosure of the defects.

As a threshold matter, this Court has said that the economic-loss rule can bar negligent-misrepresentation causes of action. *E.g.*, *Boone Ford*, 822 S.E.2d at 99. Accordingly, and for the same reasons described above in Section II(b) regarding Plaintiffs' negligence cause of action, the economic-loss rule bars Plaintiffs' negligent-

misrepresentation claims concerning the discovery and disclosure of defects to the House brought against Plaintiffs' agents, but does not apply to Plaintiffs' negligent-misrepresentation claims brought against Berkeley, Bell, or Berkeley's agents.

The purportedly false representations attributed to Berkeley, Bell, or Berkeley's agents alleged by Plaintiffs in the negligent-misrepresentation count of the amended complaint are: (1) a statement "that the house was well built[,]" attributed elsewhere in the amended complaint to Carroll; and (2) the representation "NO" in the response to Question 1 on the Disclosure Statement, i.e., whether "to your knowledge is there any problem (malfunction or defect) with . . . [the] FOUNDATION, SLAB, FIREPLACES/CHIMNEYS, FLOORS, WINDOWS (INCLUDING STORM WINDOWS AND SCREENS), DOORS, CEILINGS, INTERIOR AND EXTERIOR WALLS, ATTACHED GARAGE, PATIO, DESK OR OTHER STRUCTURAL COMPONENTS including any modification to them?"

Carroll's statement that the House was well built could not have been justifiably relied upon on by Plaintiffs in deciding whether to purchase the House, as the amended complaint establishes that Plaintiffs knew that Carroll was a real-estate agent, and does not allege that Plaintiffs thought that Carroll had helped build the House or otherwise possessed peculiar knowledge regarding the House's construction. *See Libby Hill Seafood Rests., Inc. v. Owens*, 62 N.C. App. 695, 698, 303 S.E.2d 565,

568 (1983) (vague statements of those lacking "peculiar knowledge" of the facts are not actionable misrepresentations).

Regarding the Disclosure Statement, any false representation made therein cannot be attributed to Berkeley's agents, who did not sign the Disclosure Statement, which expressly set forth that "the representations are made by the owner and not the owner's agent(s) or subagent(s)[.]" Misrepresentations within the Disclosure Statement can, however, be attributed to Berkeley and Bell, who signed the document. *See Wilson v. McLeod Oil Co.*, 327 N.C. 491, 518, 398 S.E.2d 586, 600 (1990) ("Corporate officers are liable for their torts, although committed when acting officially." (quotation marks and citation omitted)).

In its response to the Disclosure Statement's Question 1, Berkeley (through Bell and Durham) represented that as of January 2013 it was without actual knowledge of any defects to, *inter alia*, the House's windows, doors, ceilings, walls, or roof, and elsewhere within the Disclosure Statement expressly represented that it was not aware of any current issues with water leakage. In the event the Disclosure Statement became "incorrect or inaccurate[,]" the Disclosure Statement required Berkeley to furnish potential buyers with another, updated statement or to "correct the problem." The record reflects that Bell and Durham discussed significant water intrusion into the House flowing from the upper level and causing damage to the second-floor ceiling on 20 January 2014, and that Berkeley subsequently hired Cribb

to paint the House; Cribb told Carroll that he might have fixed a leak in the House. The record does not reflect that anyone else was hired to repair the water-intrusion issues identified in Bell and Durham's January 2014 correspondence, and does not reflect that an updated Disclosure Statement was ever completed and furnished to Plaintiffs.

The record thus tends to show that Berkeley and Bell: (1) were aware of significant water-intrusion issues; (2) did not hire anyone besides Cribb, a painter, to repair those issues; and (3) thereafter represented to Plaintiffs that they were not aware of any water-intrusion issues at the House before closing on the sale thereof. Although Berkeley and Bell argue that Cribb "fully repaired" the water-intrusion issues, we conclude that the record, viewed in the light most favorable to Plaintiffs, raises a genuine issue of material fact regarding whether hiring a painter to repair the water-intrusion issues was unreasonable such that Berkeley and Bell negligently misrepresented, in their response to Disclosure Statement Question 1, that they did not have actual knowledge of any problems with the House.

Berkeley and Bell counter that the fact that Plaintiffs were able to inspect and discover the water-intrusion issues themselves means that Plaintiffs did not justifiably rely upon the Disclosure Statement as a matter of law. As mentioned above, "[i]f the plaintiff could have discovered the truth upon inquiry, the complaint must allege that he was denied the opportunity to investigate or that he could not

have learned the true facts by exercise of reasonable diligence." *Songwooyarn Trading*, 213 N.C. App. at 54, 714 S.E.2d at 166.

The amended complaint alleges that Cribb was hired to conceal the water-intrusion issues, which is effectively an allegation that Plaintiffs could not have learned of the water-intrusion issues through the exercise of reasonable diligence. The record shows that Plaintiffs hired Williams to inspect the House, who testified at his deposition that he did not conduct moisture testing and did not discover the water-intrusion issues. But the record also reflects Moore's testimony disagreeing that "there [would] have been any reason for you if you went and looked at this house to cut a hole in the wall before you bought it to do intrusive testing" and agreeing that "previous damage to the house, wherever it was, was carefully painted and hidden so that the only way to discover that there was an ongoing water intrusion problem would have been to do extensive intrusion testing into the walls[.]"

This evidence, taken in the light most favorable to Plaintiffs demonstrates a genuine issue of material fact as to whether Williams' inspection amounted to the exercise of "reasonable diligence[,]" particularly because Defendants' alleged efforts to conceal the water-intrusion issues might have caused Plaintiffs to forego moisture testing and more reasonably rely upon the Disclosure Statement where Plaintiffs otherwise might not have. *See Songwooyarn Trading*, 213 N.C. App. at 55, 714 S.E.2d at 166 (rejecting justifiable reliance argument in negligent misrepresentation

context: "A plaintiff is not barred from recovery because he had a lesser opportunity to investigate representations made by someone with superior knowledge."); *Willen v. Hewson*, 174 N.C. App. 714, 719-20, 622 S.E.2d 187, 191 (2005) (rejecting reasonable reliance argument in fraud context where "defendant deliberately concealed" material facts).

The question of whether a party's reliance was justifiable for purposes of a negligent-misrepresentation claim is "one for the jury, unless the facts are so clear as to permit only one conclusion." *Marcus Bros. Textiles, Inc. v. Price Waterhouse, L.L.P.*, 350 N.C. 214, 225, 513 S.E.2d 320, 327 (1999). Because a jury could reach more than one conclusion on this issue, summary judgment for Berkeley and Bell was not appropriate on Plaintiffs' negligent-misrepresentation cause of action.

In summary, we conclude that the trial court (1) did not err by granting Plaintiffs' agents and Berkeley's agents summary judgment but (2) erred by granting Berkeley and Bell summary judgment on the negligent-misrepresentation cause of action brought against them.

### d. Breach of Fiduciary Duty

This Court has said:

> A real estate agent has the fiduciary duty to exercise reasonable care, skill, and diligence in the transaction of business entrusted to him, and he will be responsible to his principal for any loss resulting from his negligence in failing to do so. The care and skill required is that generally possessed and exercised by persons engaged in

the same business. This duty requires the agent to make a full and truthful disclosure to the principal of all facts known to him, or discoverable with reasonable diligence and likely to affect the principal. The principal has the right to rely on his agent's statements, and is not required to make his own investigation.

*Brown v. Roth*, 133 N.C. App. 52, 54-55, 514 S.E.2d 294, 296 (1999) (internal quotation marks, brackets, and citations omitted).

Plaintiffs brought their cause of action for breach of fiduciary duty against Plaintiffs' agents,[7] alleging that Plaintiffs' agents breached their fiduciary duties "by failing to take all necessary steps to ascertain the history and status of the [House] and by referring a home inspector whom [sic] [Plaintiffs' agents] knew did not undertake the usual and customary testing and investigations which would have or could have independently disclosed and discovered the substantial water intrusion issues and damages" to the House.

Plaintiffs' agents argue that their duties regarding discovery and disclosure of any defects to the House were defined by their contract with Plaintiffs.[8] While we agree as discussed in Section II(b)(2) above that the Exclusive Buyer Agency Agreement contemplates those duties, a real-estate agent's fiduciary duty is not

---

[7] Plaintiffs' agents concede in their brief on appeal that the Exclusive Buyer's Agency Agreement "create[ed] a contractual and fiduciary relationship between" Plaintiffs and Plaintiffs' agents.

[8] Plaintiffs' agents do not argue in their brief on appeal that the economic-loss rule bars Plaintiffs' fiduciary-breach claims, so we do not reach that question.

prescribed by contract, but is instead imposed by operation of law. *See Lockerman v. S. River Elec. Membership. Corp.*, 250 N.C. App. 631, 635-36, 794 S.E.2d 346, 351 (2016) (noting that *de jure* fiduciary duties, which "arise by operation of law" between "legal relations[,]" include those between "principal and agent" (citation omitted)). Plaintiffs' agents have not directed our attention to any authority setting forth that a party who undertakes to act as a fiduciary may limit the scope of that duty by contract, and we are aware of no such authority. Accordingly, the scope of the Exclusive Buyer Agency Agreement is not dispositive as to the scope of Plaintiffs' agents' duties that were owed to Plaintiffs.

While the Exclusive Buyer Agency Agreement sets forth that Plaintiffs' agents must only "disclos[e] to [Plaintiffs] all material facts related to the property or concerning the transaction of which [they] ha[ve] *actual knowledge*" (emphasis added), Plaintiffs' agents' fiduciary duty is not as limited: as noted above, a real-estate agent is required to "make a full and truthful disclosure to the principal of all facts known to him, *or discoverable with reasonable diligence* and likely to affect the principal." *Brown*, 133 N.C. App. at 54-55, 514 S.E.2d at 296 (1999) (emphasis added) (internal quotation marks, brackets, and citations omitted). Further, "[t]he principal has the right to rely on his agent's statements, and *is not required to make his own investigation.*" *Id.* (emphasis added).

Plaintiffs do not allege in the amended complaint that Plaintiffs' agents had actual knowledge of the water-intrusion issues or other defects to the House. Accordingly, the question is whether Plaintiffs' agents have established that the record reflects no genuine issue of material fact regarding Plaintiffs' agents' exercise of reasonable diligence in attempting to investigate and discover defects to the House and disclose the results of their investigation to Plaintiffs. Plaintiffs focus upon two acts that allegedly breached the fiduciary duty owed to them: (1) Plaintiffs' agents' failure to request and obtain OIA maintenance records for the House, which allegedly demonstrate a history of moisture intrusion and other defects to the House; and (2) Plaintiffs' agents' hiring of Jeff Williams to inspect the House, because Williams did not perform a moisture test, which Plaintiffs allege was "usual and customary."

Regarding the first allegation, Plaintiffs' agents argue that: (1) there is no "North Carolina Real Estate Commission ruling or advisory opinion that establishes a duty to request maintenance records for the sale of a house"; (2) Plaintiffs did not request that Plaintiffs' agents ask for the OIA maintenance records; and (3) Berkeley's agents were in possession of those records and that, if they showed material defects to the House, Berkeley's agents were obligated to produce them to Plaintiffs. But Plaintiffs' agents direct our attention to no authority setting forth that a real-estate agent's duty to investigate and disclose is limited, as a matter of law, by the North Carolina Real Estate Commission, the requests made by the agent's client,

or the fact that another who may owe the client a duty of disclosure is in possession of the information at issue.

Regarding the second allegation, Plaintiffs' agents argue that the Exclusive Buyer Agency Agreement "indemnifies [them] from any liability related to the selection of the home inspector which was the [sic] explicitly the [Plaintiffs'] duty" and that "[t]here is absolutely no evidence that Jeff Williams failed to do anything during the inspection that should have been done or that he was otherwise failed [sic] to adequately conduct a home inspection." But as explained above: (1) we are aware of no authority setting forth that the scope of a real-estate agent's fiduciary duty may be delineated or limited by contract;[9] and (2) Moore testified at his deposition that he would have identified the water-intrusion problem had he inspected the House. Further, whether a moisture test is "usual and customary" for a home inspection is not clear to us from any authorities cited by the parties, and we are therefore unable to conclude that Williams' failure to conduct such a test was unobjectionable.

As mentioned above, Plaintiffs had the right to rely upon Plaintiffs' agents' investigation and were not required to conduct their own. *Brown*, 133 N.C. App. at 54-55, 514 S.E.2d at 296. Because of that fact, and based upon the authorities cited by the parties and the record as viewed in the light most favorable to Plaintiffs, we are unable to say whether, as a matter of law, Plaintiffs' agents performed in keeping

---

[9] Plaintiffs' agents have directed our attention to no authority setting forth that a contractual indemnification provision can extinguish a cause of action, and we are aware of no such authority.

with the standard of care "generally possessed and exercised by persons engaged in the same business[,]" *Brown*, 133 N.C. App. at 54, 514 S.E.2d at 296, when they failed to request the OIA maintenance records and hired Williams to inspect the House.

Accordingly, we conclude that there exist genuine issues of material fact as to whether Plaintiffs' agents breached their fiduciary duties to Plaintiffs, and that the trial court erred by granting Plaintiffs' agents summary judgment on Plaintiffs' fiduciary-breach cause of action.

e.     Unfair and/or Deceptive Trade Practices

Although they mention the term, Plaintiffs make no argument in their brief concerning unfair and/or deceptive trade practices. Moreover, they did not file a reply brief to respond to Defendants' arguments that this cause of action was abandoned. *See* N.C. R. App. P. 28(h). We accordingly deem that aspect of Plaintiffs' appeal abandoned. N.C. R. App. P. 28(b)(6); *see Comstock v. Comstock*, 244 N.C. App. 20, 25 n.2, 780 S.E.2d 183, 186 n.2 (2015) (holding "cursory reference" insufficient to satisfy Appellate Rule 28(b)(6) where party "offers no actual substantive argument with regard to [an] issue"); *First Charter Bank v. Am. Children's Home*, 203 N.C. App. 574, 580, 692 S.E.2d 457, 463 (2010) ("It is not the role of the appellate courts to create an appeal for an appellant, nor is it the duty of the appellate courts to supplement an appellant's brief with legal authority or arguments not contained therein." (internal quotation marks, ellipsis, and citations omitted)).

f.      Breach of Contract

"The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Supplee v. Miller-Motte Bus. Coll., Inc.*, 239 N.C. App. 208, 216, 768 S.E.2d 582, 590 (2015) (quotation marks and citation omitted).

Plaintiffs brought their breach-of-contract cause of action against Berkeley and Bell, alleging breach of the Contract because Bell and Durham represented (on Berkeley's behalf) in the attached Disclosure Statement that they had no actual knowledge of any defects to the House, when they allegedly knew or should have known of water-intrusion issues rendering certain of those representations false.

As a threshold matter, Bell is correct that because he did not contract in his individual capacity with Plaintiffs, he cannot be held individually liable for any breach of the Contract. *See Keels v. Turner*, 45 N.C. App. 213, 218, 262 S.E.2d 845, 847 (1980) ("[W]here individual responsibility is demanded, the nearly universal practice in the commercial world is that the corporate officer signs twice, once as an officer and again as an individual." (quotation marks and citation omitted)).

Regarding the remaining claim against Berkeley, our Supreme Court has said that "'[i]t is elementary that where a contract or transaction was induced by false representations, the representations and the contract are distinct and separable -- that is, the representations are usually not regarded as merged in the contract.'" *Fox*

*v. S. Appliances, Inc.*, 264 N.C. 267, 270, 141 S.E.2d 522, 525 (1965) (quoting 23 Am. Jur., *Fraud and Deceit*, § 23, pp. 775-76).  Plaintiffs have cited no authority where any of our courts have held that a false representation in an N.C. Gen. Stat. § 47E disclosure statement furnished to a prospective buyer of a residence was sufficient to support a cause of action against the seller for breach of the sales contract, and we are aware of no such authority.  Further: (1) the Disclosure Statement expressly sets forth that Plaintiffs understand that Berkeley's representations do not comprise warranties regarding the facts represented, and that the representations were not intended to be substitutes for Plaintiffs' own investigation; and (2) the Contract expressly provides that Berkeley was selling the House "IN ITS CURRENT CONDITION" and that Berkeley would not provide Plaintiffs with any warranties regarding the House as part of the sale.  Neither Plaintiffs' amended complaint nor their brief on appeal direct our attention to any particular provision in the Contract setting forth that the representations made within the Disclosure Statement are terms of the Contract, and after a careful review of the Contract, we discern no provision reasonably read as creating such terms.

We therefore conclude that while a false representation within the Disclosure Statement may give Plaintiffs a basis for their cause of action alleging fraud—a tort which, if proven, allows for rescission of the contract and/or damages, *see Kee v. Dillingham*, 229 N.C. 262, 265-66, 49 S.E.2d 510, 512 (1948)—such a false

representation cannot support Plaintiffs' cause of action alleging breach of the Contract, and that the trial court did not err by granting Berkeley and Bell summary judgment thereupon.[10]

g.      Breach of the Implied Covenant of Good Faith and Fair Dealing

As with their cause of action alleging unfair and/or deceptive trade practices, Plaintiffs make no argument regarding the implied covenant of good faith and fair dealing in their initial brief, and did not file a reply brief. We therefore deem that aspect of Plaintiffs' appeal abandoned as well. N.C. R. App. P. 28(b)(6); *Comstock*, 244 N.C. App. at 25 n.2, 780 S.E.2d at 186 n.2.

h.      Fraud

Plaintiffs purported to bring separate causes of action for "Fraud and Fraud in the Inducement" and "Fraud by Concealment[.]" Because: (1) the purportedly distinct causes of action each allege false representations or omissions in inducing Plaintiffs to purchase the House; and (2) the respective elements of fraud, fraud in the inducement, and fraudulent concealment overlap on these facts, *compare Broughton v. McClatchy Newspapers, Inc.*, 161 N.C. App. 20, 31, 588 S.E.2d 20, 29 (2003)

---

[10] Because Plaintiffs (1) have abandoned their appeal regarding the trial court's ruling on their cause of action alleging breach of the implied covenant of good faith and fair dealing, *see infra* Section II(g), and (2) make no arguments regarding the breach of any other implied terms within the Contract, we have no occasion to consider (a) the impact the breach of any implied contractual terms might have upon the trial court's ruling on Plaintiffs' breach-of-contract cause of action or (b) the impact such a breach might have upon the application of the economic-loss rule to Plaintiffs' tort claims. *First Charter Bank*, 203 N.C. App. at 580, 692 S.E.2d at 463.

(elements of fraud), *with Harton v. Harton*, 81 N.C. App. 295, 298-99, 344 S.E.2d 117, 119-20 (1986) (elements of fraud in the inducement), *with Friedland v. Gales*, 131 N.C. App. 802, 807, 509 S.E.2d 793, 797 (1998) (elements of fraudulent concealment), we analyze Plaintiffs' causes of action alleging fraud as separate theories of a single cause of action alleging fraud in the inducement.

This Court has said:

> The essential elements of fraud in the inducement are:
>
> (i)     that defendant made a false representation or concealed a material fact he had a duty to disclose[;]
> (ii)    that the false representation related to a past or existing fact;
> (iii)   that defendant made the representation knowing it was false or made it recklessly without knowledge of its truth;
> (iv)    that defendant made the representation intending to deceive plaintiff;
> (v)     that plaintiff reasonably relied on the representation and acted upon it; and
> (vi)    plaintiff suffered injury.

*Harton*, 81 N.C. App. at 298-99, 344 S.E.2d at 119-20.

Plaintiffs brought their fraud cause of action against Berkeley, Bell, and Berkeley's agents, alleging that those four Defendants "made false representations and/or concealments of a material fact regarding the existence of long-standing, chronic and substantial water intrusion and damages as well as the history of not properly repairing the same." Plaintiffs alleged that all four Defendants were, by virtue of Plaintiffs' offer to purchase the House, under a duty to disclose all material

facts regarding the House to them, and that: (1) Carroll defrauded Plaintiffs by saying that he would buy the House if he could; (2) Berkeley and Bell defrauded Plaintiffs by filling out the Disclosure Statement representing that they had no knowledge of water-intrusion issues at the House; and (3) all four Defendants defrauded Plaintiffs by failing to disclose the history of water-intrusion issues and the fact that the issues had not been properly repaired. Rather than properly repair the water-intrusion issues, Plaintiffs alleged that these four Defendants took active steps to conceal the issues and thereby deceived them, which both made Plaintiffs' reliance upon the alleged false representations reasonable and excused Plaintiffs' own failure to discover the issues. Plaintiffs acted upon the four Defendants' alleged fraud by closing on the House at full price, and suffered injury by, *inter alia*, repairing the House once the defects to the House became evident.

## 1. *Carroll's statement*

Carroll's statement that he would buy the House if he could is vague "puffing" that is not material and could not be reasonably relied upon by Plaintiffs in deciding whether to purchase the House, and accordingly is inadequate as an allegation of fraud. *See Rowan Cty. Bd. of Educ. v. United States Gypsum Co.*, 332 N.C. 1, 17, 418 S.E.2d 648, 659 (1992) ("mere puffing, guesses, or assertions of opinions" are not actionable as fraud).

### 2.      *Representations within the Disclosure Statement*

As discussed above in Section II(b)(1), the record tends to show that Berkeley and Bell (1) were aware of water-intrusion issues at the House, (2) hired only a painter to address those issues, and (3) thereafter represented to Plaintiffs that they were not aware of any water-intrusion issues at the House.

Berkeley and Bell argue that: (1) the economic-loss rule bars Plaintiffs' fraud claims; (2) the record does not contain any evidence that any representation in the Disclosure Statement was made with knowledge of the representation's falsity; and (3) Plaintiffs cannot establish that they reasonably relied upon any of the alleged false representations.

The economic-loss rule does not apply to Plaintiffs' fraud causes of action, because the alleged false representations within the Disclosure Statement (like the alleged omissions discussed *supra* Section II(f)) could not have breached the terms of the Contract.  Moreover, this Court has expressly set forth that the economic-loss rule does not bar fraud claims, even where the alleged fraud also breaches a contractual term between the parties.  *See Bradley Woodcraft, Inc. v. Bodden*, 251 N.C. App. 27, 34, 795 S.E.2d 253, 259 (2016) ("while claims for negligence are barred by the economic loss rule where a valid contract exists between the litigants, claims for fraud are not so barred and, indeed, the law is, in fact, to the contrary: a plaintiff may assert both claims." (internal quotation marks, brackets, and citation omitted)).

Regarding Berkeley and Bell's second argument that the record does not contain any evidence that any representation in the Disclosure Statement was made with knowledge of the representation's falsity, we do not agree. The evidence in the record, viewed in the light most favorable to Plaintiffs, reflects a genuine issue of material fact regarding whether Berkeley and Bell were aware of unrepaired water-intrusion issues at the House at the time Berkeley furnished the Disclosure Statement to Plaintiffs representing that Berkeley (through Bell and Durham) was unaware of such issues. Because Defendants have not directed our attention to authority setting forth otherwise, the question of whether a painter's purported repair of a leak eliminated Bell and Durham's knowledge regarding the water-intrusion issues is appropriate for a jury to decide as a matter of fact, not a judge as a matter of law. *Cf. Clouse*, 115 N.C. App. at 509, 445 S.E.2d at 433 (defendant "would have no reason to question [surveyor]'s affirmative representation and make her own independent investigation when [surveyor]'s expertise was specifically in the area of conducting surveys and when he was paid to specifically conduct such survey"). Indeed, even if Bell were to testify that he had no such knowledge, the jury would still be free to not credit that testimony and find otherwise in light of the other evidence in the record. *See Smith v. Beasley*, 298 N.C. 798, 801, 259 S.E.2d 907, 909 (1979) ("It is the function of the jury alone to weigh the evidence, determine the

credibility of the witnesses and the probative force to be given their testimony, and determine what the evidence proves or fails to prove.").

Finally, we also reject Berkeley and Bell's argument that the fact that Plaintiffs were able to inspect and discover the water-intrusion issues themselves means that Plaintiffs did not reasonably rely upon the Disclosure Statement as a matter of law, for the same reasons we reject Berkeley and Bell's argument regarding justifiable reliance above in Section II(c).

We have said that "[i]n an arm's-length transaction, when a purchaser of property has the opportunity to exercise reasonable diligence and fails to do so, the element of reasonable reliance is lacking and the purchaser has no action for fraud." *RD&J Props. v. Lauralea-Dilton Enters., LLC*, 165 N.C. App. 737, 746, 600 S.E.2d 492, 499 (2004) (internal quotation marks and citations omitted). But even if the plaintiff fails to make its own investigation, the plaintiff's fraud claim will not fail where "(1) it was denied the opportunity to investigate the property, (2) it could not discover the truth about the property's condition by exercise of reasonable diligence, or (3) it was induced to forego additional investigation by the defendant's misrepresentations." *Id.* (internal quotation marks and citation omitted).

As discussed in more detail above in Section II(c), the record reflects that: (1) Plaintiffs hired Williams to inspect the House; Williams testified that he did not conduct moisture testing or discover the water-intrusion issues; and (2) Moore

testified that he saw no reason to conduct moisture testing based upon a visual inspection of the House, and that he believed previous damage to the house had been carefully hidden so that the damage was only discoverable if such testing was undertaken. This evidence, taken in the light most favorable to Plaintiffs, demonstrates that genuine issues of material fact exist regarding whether (1) Williams' inspection amounted to the exercise of "reasonable diligence" and (2) whether Defendants induced Plaintiffs to forego moisture testing and rely upon their allegedly-false representations within the Disclosure Statement. *See Willen*, 174 N.C. App. at 719-20, 622 S.E.2d at 191 (rejecting reliance argument where "defendant deliberately concealed" material facts); *Libby Hill*, 62 N.C. App. at 698, 303 S.E.2d at 568 ("An action in fraud for misrepresentations regarding realty will lie . . . where the purchaser has been fraudulently induced to forego inquiries which he otherwise would have made. . . . Thus, where material facts are available to the vendor alone, he or she *must* disclose them." (citations omitted)).

In the fraud context, "[t]he reasonableness of a party's reliance is a question for the jury, unless the facts are so clear that they support only one conclusion." *Forbis v. Neal*, 361 N.C. 519, 527, 649 S.E.2d 382, 387 (2007). Because, for the aforementioned reasons, the record reasonably supports more than one conclusion, we conclude that genuine issues of material fact exist regarding whether Berkeley and Bell defrauded Plaintiffs by providing them with the Disclosure Statement, and

that the trial court erred by granting Berkeley and Bell summary judgment on Plaintiffs' fraud cause of action.

### 3. *Non-disclosure of water intrusion and repairs*

Finally, Plaintiffs argue that Berkeley, Bell, and Berkeley's agents defrauded them by failing to disclose the history of water-intrusion issues and the fact that the issues had not been properly repaired.

This Court has said:

> A duty to disclose material facts arises where material facts are accessible to the vendor only, and he knows them not to be within the reach of the diligent attention, observation and judgment of the purchaser. In other words, in order to establish fraud based upon a seller's failure to disclose material defects, a buyer must, in part, show that the material defects were not discoverable in the exercise of the buyer's diligent attention or observation.

*Everts v. Parkinson*, 147 N.C. App. 315, 325, 555 S.E.2d 667, 674 (2001) (internal quotation marks, emphasis, and citations omitted). Moreover, a seller's real-estate agent has a duty to disclose known material facts to a prospective buyer, or else he may be personally liable for fraud. *Johnson v. Beverly-Hanks & Assocs., Inc.*, 328 N.C. 202, 210, 400 S.E.2d 38, 43 (1991) (reversing summary judgment for defendant broker on fraud claim because of conflicting testimony regarding whether defendant concealed material fact from buyer); *Clouse*, 115 N.C. App. at 508, 445 S.E.2d at 432-33. ("A broker has a duty not to conceal from the purchasers any material facts and to make full and open disclosure of all such information. This duty applies, however,

to material facts known to the broker and to representations made by the broker." (internal quotation marks, brackets, and citation omitted)).

Because the four Defendants dispute neither (1) that they were aware of the previous water-intrusion issues at the House and the circumstances surrounding Cribb's purported repair work nor (2) that they did not disclose those facts to Plaintiffs, the question is whether the four Defendants had a duty to disclose those facts. That question itself requires consideration of whether those facts were (1) material and (2) "not discoverable in the exercise of the [Plaintiffs'] diligent attention or observation." *Everts*, 147 N.C. App. at 325, 555 S.E.2d at 674.

As set forth above in Sections II(b)(1) and II(c), these are questions for a jury to decide. First, because Defendants have not directed our attention to any authority setting forth that because a painter said he might have fixed a leak at a residence, the fact of previously-material water-intrusion issues at the residence and the circumstances surrounding the painter's work are rendered immaterial as a matter of law, we conclude that such a question presents a genuine issue of material fact. Second, we are also unable to say as a matter of law that the water-intrusion issues were discoverable in the exercise of Plaintiffs' diligent attention. Although Plaintiffs may have been able to but did not obtain the full OIA maintenance records or conduct moisture testing at the House, whether taking such steps is necessary for a buyer to be diligent for reasonable reliance purposes is less than clear from the authorities

cited by the parties. Therefore, the questions of whether the four Defendants (1) owed Plaintiffs a duty to disclose the facts of the previous water-intrusion issues and what they undertook to repair those issues and (2) defrauded Plaintiffs by omission by failing to disclose those facts[11] depend upon the resolution of genuine issues of material fact, and we accordingly conclude that Plaintiffs must be given the opportunity to persuade a jury that the answers to those questions require that they be given relief on their alleged injuries.

In sum, we conclude that the trial court erred by granting the four Defendants summary judgment on Plaintiffs' fraud cause of action.

### i.  Personal Liability

Finally, Plaintiffs make no argument regarding their cause of action brought against Bell for personal liability, and we also deem that aspect of Plaintiffs' appeal abandoned. N.C. R. App. P. 28(b)(6).

### III.  Conclusion

For the aforementioned reasons, we affirm the grant of summary judgment as to Plaintiffs' causes of action alleging: (1) negligence, against Plaintiffs' agents;

---

[11] It is worth noting the interplay between Plaintiffs' fraud theories. The fact that Berkeley and Bell made affirmative representations about the House in the Disclosure Statement may mean that their failure to disclose the water-intrusion issues and Cribb's purported repairs—which they might not have been required to disclose in the absence of such affirmative representations—amounted to fraud by omission. *See Ragsdale v. Kennedy*, 286 N.C. 130, 139, 209 S.E.2d 494, 501 (1974) ("even though a vendor may have no duty to speak under the circumstances, nevertheless if he does assume to speak he must make a full and fair disclosure as to the matters he discusses.").

(2) negligent misrepresentation, against Plaintiffs' agents and Berkeley's agents; (3) unfair and/or deceptive trade practices, against Berkeley, Bell, and Berkeley's agents; (4) breach of contract, against Bell; (5) breach of the implied covenant of good faith and fair dealing, against Berkeley and Bell; and (6) personal liability, against Bell.

For the aforementioned reasons, we reverse the grant of summary judgment as to Plaintiffs' causes of action alleging: (1) negligence, against Berkeley's agents; (2) negligent misrepresentation, against Berkeley and Bell; (3) breach of fiduciary duty, against Plaintiffs' agents; (4) fraud and fraud in the inducement, against Berkeley, Bell, and Berkeley's agents; and (5) fraud by concealment, against Berkeley, Bell, and Berkeley's agents, all of which we remand for further proceedings consistent with this opinion.

AFFIRMED IN PART.  REVERSED AND REMANDED IN PART.

Judge HAMPSON concurs.

Judge ARROWOOD concurs in part and dissents in part per separate opinion.

ARROWOOD, Judge, concurring in part and dissenting in part.

I concur fully with that portion of the opinion in so far as it affirms the grant of summary judgement to the defendants on any claims. I also concur with that portion of the opinion which reverses summary judgment with respect to negligent misrepresentation, and the fraud claims in whatever form pled against defendants Berkeley and Bell.

However, for the reasons set forth below, I dissent from that portion of the majority's opinion that reverses summary judgement with respect to any claim against either plaintiffs' or Berkeley's real estate agents.

The majority reversed the grant of summary judgment with respect to: (1) breach of fiduciary duty against plaintiffs' agents; (2) negligence against Berkeley's agents; (3) fraud and fraud in the inducement, against Berkeley, Bell, and Berkeley's agents; and (4) fraud by concealment, against Berkeley, Bell, and Berkeley's agents. I address the claims against plaintiffs' agents first, and then defendant-Berkeley's agents.

## 1. Breach of Fiduciary Duty

I first address plaintiffs' claim against their real estate agents for breach of fiduciary duty. As the majority noted, in *Brown v. Roth*, we described a real estate agent's fiduciary duty as follows:

> A real estate agent has the fiduciary duty to exercise
> reasonable care, skill, and diligence in the transaction of
> business [e]ntrusted to him, and he will be responsible to

> his principal for any loss resulting from his negligence in failing to do so. The care and skill required is that generally possessed and exercised by persons engaged in the same business. This duty requires the agent to make a full and truthful disclosure [to the principal] of all facts known to him, or discoverable with reasonable diligence and likely to affect the principal.

133 N.C. App. 52, 54-55, 514 S.E.2d 294, 296 (1999) (quotation marks and citations omitted). Plaintiffs contend that their real estate agents failed to exercise reasonable care because they did not provide plaintiffs with information that plaintiffs assert would have been discoverable with reasonable diligence. Specifically, plaintiffs allege that their agents, the Rudd agency, Rudd-Gaglie, and Goodman, violated their fiduciary duties when they (1) failed to discover and disclose water intrusion issues in the House and (2) negligently recommended Williams, who did not perform moisture testing. The majority asserts that whether the real estate agents acted with reasonable diligence is a question for the jury. However, the facts of this case reveal that while the plaintiffs' real estate agents did not take every possible action they could to discover every single piece of information about the House, they certainly took reasonable actions to do so.

This is not a case where a buyer's agent failed to disclose material information or failed to take actions usually taken by competent real estate agents. On the contrary, plaintiffs' agents obtained all information and documents requested by plaintiffs, procured a qualified home inspector to inspect the home prior to purchase,

connected plaintiffs with various repairmen, and obtained a termite inspection. Although the home inspector, Williams, ultimately decided not to conduct a moisture test based upon his professional opinion that it was not necessary to perform one, this decision cannot be attributed to plaintiffs' agents. Plaintiffs have not presented any evidence Williams was incompetent or otherwise not qualified to perform the inspection. Thus, plaintiffs' agents' fiduciary duty to plaintiffs was satisfied upon their suggestion to plaintiffs of a home inspector and general contractor who was well-qualified to perform the inspection. Plaintiffs' agents, who are not licensed and experienced home inspectors or general contractors, exercised reasonable diligence to discover any defects in the House by suggesting a qualified home inspector, and they reasonably relied on Williams' assessment of the home. *See Clouse v. Gordon*, 115 N.C. App. 500, 509, 445 S.E.2d 428, 433 (1994) (holding it was reasonable for real estate agent to rely on expert opinion of independent surveyor of property).

The one action plaintiffs' agents failed to take was one that plaintiffs have failed to show was either customary or necessary – requesting the OIA maintenance records. While the maintenance records would have revealed past issues with the House that had presumably been dealt with, it was reasonable for plaintiffs' agents to arrange for a home inspection because the home inspection was expected to reveal present issues with the House that needed to be fixed. Thus, the home inspection should have, and in fact did, reveal the same type of information that the

maintenance reports contained. Though the home inspection did not reveal the significant water intrusion issues, this was only because Williams did not believe a moisture test was necessary.

In addition, as plaintiffs' own expert, Moore, testified, there would have been no reason for a home inspector to conduct intrusive moisture testing because the water damage was not readily apparent. Neither the plaintiffs nor the majority is able to provide any support for the proposition that a real estate agent who took reasonable actions to discover material information about the House at issue breached their fiduciary duty by not taking every action possible to obtain information about the House. Moreover, plaintiffs' agents also complied with the Rules of Real Estate Commission throughout their dealings with plaintiffs and met all of the duties set forth in the Exclusive Buyer's Agency Agreement with plaintiffs. I therefore respectfully disagree with the majority that the trial court erred in granting summary judgment for plaintiffs' agents on this issue.

### 2. Negligence and Fraud by Berkeley's Agents

Plaintiffs additionally contend defendants Carroll and RE/MAX, Berkeley's real estate agents, were negligent. To establish negligence, plaintiffs must show that defendants (1) owed them a duty, (2) breached that duty, (3) plaintiffs suffered injury, and (4) the breach of duty was the proximate cause of the injury to plaintiffs. *Id.* at 508, 445 S.E.2d at 432 (quoting *Simpson v. Cotton*, 98 N.C. App. 209, 211, 390 S.E.2d

345, 346 (1990)). As the majority explained, "[a] broker has a duty not to conceal from the purchasers any material facts and to make full and open disclosure of all such information." *Johnson v. Beverly-Hanks & Assoc.*, 328 N.C. 202, 210, 400 S.E.2d 38, 43 (1991) (citing *Spence v. Spaulding and Perkins, Ltd.*, 82 N.C. App. 665, 347 S.E.2d 864 (1986)). "This duty [only] applies, however, to material facts known to the broker and to representations made by the broker." *Clouse*, 115 N.C. App. at 508, 445 S.E.2d at 432-33. In addition, the purchaser also has a duty to protect their own interests, as "it is the policy of the courts not to encourage negligence and inattention to one's own interest." *Id.* at 509, 445 S.E.2d at 433.

In the present case, Carroll had a duty to disclose all material facts known to him. After Carroll listed the property, he was made aware that the House had a water leakage problem which left a stain on the living room ceiling and caused some rotting in one of the guest bedrooms. Carroll hired Cribb to perform work on the House which included painting various areas of the House and repairing cracks. After completing the requested work on the House, Cribb represented to Carroll that he thought he found the leak causing the water intrusion problems and repaired it as well. The majority believes there is a question as to whether the water intrusion issue was successfully repaired such that it was no longer a material fact that Carroll needed to disclose. However, the evidence shows Carroll was told that the leak was repaired and he did not see any signs of water intrusion thereafter. Plaintiffs' own

professional inspection of the House, which occurred three days after it had rained in the area, also did not reveal any significant water intrusion issues.

As we noted in *Clouse*, a real estate agent would have no reason to question the expert opinion of a professional surveyor, or in this case, inspector. *Id.* Thus, even if Carroll had initially not been completely certain the water leak had been repaired, it would have been reasonable for him to rely on the inspection report as an accurate assessment of the present condition of the House. Furthermore, plaintiffs also had a duty to preserve their own interests. *Id.* Though the inspection report did not reveal any significant water intrusion, it did, however, alert plaintiff to the presence of minor leaks and areas on the exterior of the House that needed to be sealed in order to keep out water and insects. Plaintiffs were thus made aware of leaks and potential water intrusion problems in the House prior to their purchase, further rendering Carroll's knowledge of the prior leak immaterial. The report also advised plaintiffs to conduct additional inspection with respect to the recommended repairs, yet they neglected to do so. This Court has recognized that contributory negligence is a complete bar to a plaintiff's negligence claim. *Swain v. Preston Falls East, L.L.C.*, 156 N.C. App. 357, 361-62, 576 S.E.2d 699, 702-703 (2003). Berkeley's real estate agents should not be held responsible for plaintiffs' own negligence.

I am thus unable to conclude Berkeley's agents were negligent as a matter of law and would affirm the trial court's grant of summary judgment on the matter. I

also note that the majority does not cite to any authority supporting the proposition that a real estate agent's duty should extend so far. In my view, the proper party to sue for negligence here would be the home inspector, who neglected to conduct a moisture test despite discovering minor leaks in the House.

Furthermore, I am also unable to concur with the majority's opinion that Berkeley's agents committed fraud in the inducement and by concealment by not informing plaintiffs of prior water intrusion issues. "A broker who makes fraudulent misrepresentations or *who conceals a material fact* when there is a duty to speak . . . is personally liable to the purchaser notwithstanding that the broker was acting in the capacity of agent for the seller." *Johnson,* 328 N.C. at 210, 400 S.E.2d at 43 (emphasis in original) (citation omitted). For the same reasons I would hold Carroll and RE/MAX were not negligent, I also find they did not commit fraud.

Carroll did not conceal a material fact that he had a duty to disclose, and also made no false representations. Carroll did not inform plaintiffs of prior water intrusion issues in the House because he reasonably believed the source of the water leak had been repaired. Thus, his nondisclosure did not amount to concealing a material fact in order to induce plaintiffs to purchase the House. Rather, there is evidence in the record showing that Carroll did not mention the water leak because he simply believed it was no longer an issue, and was thus immaterial. As such, Carroll was under no duty to disclose that information.

7

This Court addressed a similar issue in *MacFadden v. Louf*, 182 N.C. App. 745, 643 S.E.2d 432 (2007).  There, we rejected the home-purchaser's fraud claim based on a lack of reasonable reliance, holding that "[p]laintiff failed to establish that her reliance was justifiable because she conducted a home inspection before closing and that inspection report put her on notice of potential problems with the home."  *Id.* at 748, 643 S.E.2d at 434.  We reasoned that the inspection report pointed out potentially serious problems and advised the plaintiff to conduct an additional inspection.  *Id.* at 749, 643 S.E.2d at 435.  Similarly, in the present case, the inspection report noted a variety of issues with the House requiring repairs, including:  (1) minor damage to the roof; (2) areas on the exterior of the House needing "to be sealed to keep water and insect [sic] from entering the home"; (3) doors that failed to close or otherwise seal properly; (4) windows that exhibited rust stains and would not open; and (5) minor leaks causing mold to grow.  The report also provided that "[i]t is recommended that qualified contractors be used in your further inspection or repair issues as it relates to the comments in this inspection report."

As the majority correctly noted, this Court has said that "[i]n an arm's-length transaction, when a purchaser of property has the opportunity to exercise reasonable diligence and fails to do so, the element of reasonable reliance is lacking and the purchaser has no action for fraud."  *RD&J Props. v. Lauralea-Dilton Enters., LLC*, 165 N.C. App. 737, 746, 600 S.E.2d 492, 499 (2001) (citing *Calloway v. Wyatt*, 246

N.C. 129, 134, 97 S.E.2d 881, 885-86 (1957)). Because plaintiffs were made aware of water leakage issues and were advised to have the House undergo further inspection but neglected to do so, I would hold they did not exercise reasonable diligence and cannot now claim they were fraudulently induced by Berkeley's agents. Accordingly, I would affirm the trial court's grant of summary judgment on the matter, and respectfully dissent.